[No. B206896. Second Dist., Div. Three. July 17, 2009.]

LINDA L. BOSETTI, Plaintiff and Appellant, v.
THE UNITED STATES LIFE INSURANCE COMPANY IN THE CITY OF
NEW YORK et al., Defendants and Respondents.

[No. B208835. Second Dist., Div. Three. July 17, 2009.]

LINDA L. BOSETTI, Plaintiff and Appellant, v.
PALOS VERDES PENINSULA UNIFIED SCHOOL DISTRICT, Defendant
and Respondent.

COUNSEL

Tyron J. Sheppard for Plaintiff and Appellant.

Wilson, Elser, Moskowitz, Edelman & Dicker, Adrienne Publicover, Michael K. Brisbin and Charan M. Higbee for Defendants and Respondents The United States Life Insurance Company in the City of New York and Keenan & Associates.

Atkinson, Andelson, Loya, Ruud & Romo and Marlon C. Wadlington for Defendant and Respondent Palos Verdes Peninsula Unified School District.

OPINION

**CROSKEY, J.**—Plaintiff and appellant Linda L. Bosetti was employed by defendant and respondent Palos Verdes Peninsula Unified School District (PVSD). As part of her employment benefits, she was covered under a group long-term disability insurance policy (the policy) issued by The United States Life Insurance Company in the City of New York (U.S. Life). The third party claims administrator for the policy was Keenan & Associates (Keenan).

Bosetti's job was eliminated for economic reasons. Shortly after she learned that her employment would be terminated, she saw a doctor for depression and was placed on temporary disability. Her disability would ultimately extend for two years, and had a physical component as well as an emotional one. Under the policy, Bosetti could obtain disability benefits for two years if she was disabled from her own occupation. After that time, she could only obtain disability benefits if she was disabled from any occupation. Keenan directed Bosetti to perform a Functional Capacity Evaluation (FCE); the results of the FCE indicated that Bosetti could perform sedentary or light physical work. Therefore, U.S. Life concluded that Bosetti was not disabled from any occupation and terminated her disability benefits at the end of two years.

Bosetti brought suit against U.S. Life, Keenan, and PVSD, seeking additional disability benefits. Keenan successfully demurred on the basis that, as a third party claims administrator, it could not be liable on the policy. PVSD sought summary judgment on the basis that it had fulfilled every duty it owed Bosetti as her employer, and that any coverage disputes were exclusively between Bosetti and U.S. Life. PVSD was granted summary judgment, and was also awarded its costs and attorney fees under Code of Civil Procedure section 1038.

During the course of the litigation, U.S. Life concluded that, regardless of whether Bosetti was still disabled after two years of payments, another defense was available to it. The policy limited benefits for disabilities due to "mental, nervous or emotional disorder[s]" to only two years. U.S. Life took the position that, although Bosetti ultimately suffered some level of physical disability, she did not suffer a physical disability prior to the termination of her employment. As coverage under its policy ceased at the time of the termination of Bosetti's employment, U.S. Life argued there could be no coverage for any physical disability which may have arisen thereafter. U.S. Life sought, and obtained, summary judgment on this basis.

Bosetti filed two notices of appeal, one with respect to judgment in favor of U.S. Life (No. B206896) and the other challenging the judgment and order entered in favor of PVSD (No. B208835).[1] Bosetti, however, did not file a notice of appeal from the judgment of dismissal in favor of Keenan, and we will therefore dismiss her appeal in No. B206896 to the extent it challenges that dismissal. Bosetti's complaint against PVSD alleged no legitimate cause of action against PVSD, and we will therefore affirm the summary judgment and order awarding attorney fees in favor of PVSD. In addition, we will remand for a determination of any attorney fees on appeal to which PVSD might be entitled under Code of Civil Procedure section 1038. Finally, as to U.S. Life, we conclude that the mental disability exclusion does not apply when the insured suffered related mental and physical symptoms, and that a triable issue of fact exists as to whether Bosetti suffered from a disability which was not wholly mental while the policy was still in force. We will therefore reverse the summary judgment in favor of U.S. Life. We also conclude, however, that (1) U.S. Life had an objectively reasonable factual and legal basis for its denial of further benefits after two years; and (2) there was no evidence presented showing that U.S. Life had made any intentional misrepresentations or had intentionally inflicted any emotional distress upon Bosetti. For the reasons we explain below, we will therefore direct the trial court to grant summary adjudication in favor of U.S. Life on Bosetti's bad faith and intentional tort causes of action.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Bosetti First Seeks Medical Assistance

Bosetti worked for PVSD as an assistant director of adult education. She was entitled to disability insurance benefits under the policy. In January 2003, PVSD eliminated Bosetti's position for budgetary reasons. The position was eliminated effective March 3, 2003.

---

[1] We have consolidated these two appeals for disposition in a single opinion.

After learning in January that her position would be terminated, Bosetti saw her physician, Dr. Barbara Lebron-Caine. She had first seen Dr. Lebron-Caine earlier in that month. At her initial appointment, Bosetti had filled out a medical history questionnaire indicating that she was then being treated for allergies, gastric reflux, and fibromyalgia.[2] Nonetheless, Bosetti indicated in the medical history that she was "reasonably healthy" and not experiencing any "major health problems."

Bosetti returned to Dr. Lebron-Caine on January 22, 2003, after having been notified that her job would be eliminated.[3] Bosetti testified that she went to see Dr. Lebron-Caine for insomnia; she wanted sleeping pills. Bosetti said that, during the examination, Dr. Lebron-Caine told her that she was suffering from depression and anxiety disorder. Dr. Lebron-Caine would later characterize Bosetti's state at the time as a "nervous breakdown." Although Dr. Lebron-Caine noted that Bosetti was then suffering from generalized aches and pains, her primary concerns were Bosetti's depression and anxiety. Bosetti was referred to a behavioral health and psychotherapy specialist, as well as a psychiatrist. Dr. Lebron-Caine put Bosetti on temporary disability based on depression and anxiety.

## 2. *Bosetti Submits a Claim for Benefits*

Bosetti submitted a claim for disability benefits. On January 30, 2003, Bosetti filled out U.S. Life's application for long-term disability benefits. In the space on the form asking for the "first symptoms of [Bosetti's] illness," Bosetti wrote: "Paraly[z]ing depression, inability to concentrate, mental confusion, insomnia, pain—headache pain—increased fibromyalgia pain in muscles in whole body. Poor concentration is affecting my ability to safely drive."

## 3. *Further Medical Evaluations Before Termination of Bosetti's Employment*

Bosetti's attending physicians were required to complete U.S. Life's attending physician's statement forms documenting her condition, disability, and prognosis. The form has a section entitled "Physical Impairment" and another entitled "Mental/Nervous Impairment." In each section, the physician can check a box between "Class 1" and "Class 5," indicating the level of the

---

[2] Fibromyalgia is a syndrome characterized by chronic pain in the muscles and soft tissues surrounding joints, fatigue, and tenderness at specific sites in the body.

[3] Bosetti testified at deposition that she returned to Dr. Lebron-Caine after she had been notified that her position would be eliminated. The board of education did not adopt a resolution eliminating the position until January 23, 2003, the day after Bosetti's visit to Dr. Lebron-Caine.

patient's impairment. On February 4, 2003, Dr. Lebron-Caine completed an attending physician's statement. In the "Physical Impairment" section, Dr. Lebron-Caine wrote "N.A." She indicated a Class 5 Mental/Nervous impairment. At her deposition, Dr. Lebron-Caine testified that she thought, at the time she completed this form, that Bosetti's problems were emotional and not physical.

Dr. Lebron-Caine completed one further attending physician's statement prior to the termination of Bosetti's employment. On February 24, 2003, Dr. Lebron-Caine's attending physician's statement reflects both a physical and a mental/nervous impairment. Under "Physical Impairment," Dr. Lebron-Caine checked the box for a Class 5 impairment, which is defined on the form as "Severe limitation of functional capacity, incapable of minimal (Sedentary) activity." In the "Remarks" section for the physical impairment, Dr. Lebron-Caine wrote, "Mental Impairment affects her ability to work. 2$^{ary}$ physical impairment." Under "Mental/Nervous Impairment," Dr. Lebron-Caine also indicated a Class 5 ("severe limitations") impairment. At her deposition, Dr. Lebron-Caine explained that she did not diagnose a physical disability independent of Bosetti's emotional disability; instead, the physical disability was secondary to the emotional one. Dr. Lebron-Caine believed Bosetti's physical impairment was her body's reaction to her severe depression and anxiety, rendering her unable to function. According to Bosetti, however, it was "the other way around." Bosetti testified that her depression was secondary to her physical pain, although she conceded that stress exacerbated her physical pain.

### 4. Disability Benefits Are Granted to Bosetti

As stated above, Bosetti initially applied for disability benefits after Dr. Lebron-Caine placed her on temporary disability on January 23, 2003. Keenan comanaged Bosetti's claim along with an entity referred to as DRMS. Based on Bosetti's reference to pain in the claim form and Dr. Lebron-Caine's identification of a physical impairment, DRMS and Keenan decided to telephone Bosetti and determine whether her disability was purely mental, or whether she was then obtaining medical treatment for a physical condition as well. According to Keenan, Bosetti indicated in a telephone conversation that her disability was purely mental. There is no writing signed by Bosetti confirming that she did not seek disability payments for a physical disability. DRMS and Keenan agreed to approve Bosetti for disability payments for a mental disability, but not a physical disability. On March 18, 2003, Keenan wrote Bosetti, indicating that her claim had been approved. At this time, it was not Keenan's practice to include in the approval letter the nature of the condition for which benefits were approved. In other words, Keenan never told Bosetti that she was approved for only mental disability, and not physical

disability, payments. The policy had a 60-day elimination period, so Bosetti's benefits began on March 24, 2003.

### 5. *Further Treatment After Bosetti's Employment Is Terminated*

Subsequent to the March 3, 2003 termination of her employment, Bosetti suffered from further physical problems. In March 2003, she indicated to her psychologist that her fibromyalgia pain increased. In April 2003, Dr. Lebron-Caine referred Bosetti to a fibromyalgia specialist. That same month, Bosetti told her psychiatrist that she was experiencing back pain, in addition to the increased fibromyalgia pain. Eventually, X-rays and MRI's were performed, which indicated that Bosetti suffered from degenerative disk disease, herniated disks, and bone spurs. According to Bosetti, her orthopedic physicians agreed that, given the level of degeneration, Bosetti likely had degenerative disk disease *prior* to January 2003.

### 6. *After Two Years of Benefits, U.S. Life Determines Bosetti Is Not Disabled from "Any Occupation" and Terminates Benefits*

The policy had two limitations that went into effect after two years: first, payments for mental or emotional disorders were expressly limited to two years; second, payments for a disability from the insured's "own occupation" would end after two years; benefits would continue only if the insured was disabled from *any* occupation. In that situation, benefits would continue until age 65. On January 13, 2005, Keenan wrote plaintiff informing her of both limitations and noting that Bosetti would have received two years of benefits by March 23, 2005. Keenan indicated, "we are continuing to review your claim for any physical restrictions."

Bosetti was required to perform a physical FCE to determine whether she could return to work in any occupation. Bosetti attended the evaluation and attempted to test her limitations. However, she would later object that the evaluators, who were not physicians,[4] had pushed her too far and caused her extreme back pain which lingered for days after the evaluation. On March 31,

---

[4] Bosetti objected to much of the evidence submitted in connection with U.S. Life's summary judgment motion as unauthenticated. The trial court did not rule on the objections, although Bosetti's counsel requested a ruling at the hearing. Our review of the record demonstrates that the evidence, which was authenticated by U.S. Life's director for life and disability claims, was properly authenticated. Bosetti additionally specifically objected to the report of an FCE conducted by nonphysicians. Bosetti argued that the policy gave U.S. Life the right to request that Bosetti be evaluated by a *doctor* of its choice, and that the FCE report prepared by nonphysicians was therefore not relevant to any issue under the policy. We disagree. Bosetti conceivably had a right to refuse to perform the FCE because it was not supervised by a medical doctor; however, once the FCE was performed, Bosetti cannot seek to disregard its results simply because a physician was not involved. The fact that the FCE was not performed by a physician goes to its weight, not its admissibility.

2005, Keenan wrote to Bosetti indicating that, based on its review of her FCE results as well as the entire file, Bosetti had the capacity to perform sedentary to light physical demands.[5] Thereafter, a vocational assessment was done, in order to determine whether Bosetti was capable of working in any occupation based on the results of her FCE, in light of her education and work history. The vocational assessment report concluded that Bosetti could perform her own occupation of associate director of adult education, as well as the two previous occupations she held, administrator, and employment and training coordinator. Additionally, six other occupations were identified based on Bosetti's "level of education, employment history, transferable skills and functional capacity." The vocational assessment report indicated that Bosetti "should be able to perform all of [these] occupations using her transferable work skills. These occupations are considered to require college education plus work experience and with her advanced degree in Education and her work history, [Bosetti] would meet these expectations. Employers are willing to provide some job specific training regarding the needs of their individual business. These jobs are sedentary or light duty and would meet [Bosetti's] current work restrictions."[6] As Bosetti was not disabled from any occupation (or, indeed, her prior occupation), Keenan indicated Bosetti's claim was closed.[7]

---

[5] This appears to be in line with Bosetti's testimony that she did some volunteer work in 2004, involving light typing, stuffing envelopes, and visiting terminally ill patients in their homes. She also testified that she typically did "very light housework," including loading the dishwasher and doing laundry. She could not vacuum.

[6] The vocational assessment report also identified an "SVP" for each occupation. The SVP was defined as "Specific Vocational Preparation, [which is] the usual amount of time spent by the typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job." The SVP for each of Bosetti's previous occupations was 7 or 8; the SVP for the newly identified occupations was 6, 7, or 8. An SVP of 6 was a range from one to two years; an SVP of 7 was two to four years; and an SVP of 8 was four to 10 years. On appeal, Bosetti would argue that none of the other occupations identified were occupations which she was qualified to perform without substantial retraining, as their SVP's indicated a range of between one and 10 years of necessary training. (See *Erreca v. West. States Life Ins. Co.* (1942) 19 Cal.2d 388, 395 [121 P.2d 689] [when considering whether an insured is able to perform "any" employment, one can consider only occupations the insured can perform without retraining].) We disagree. The text of the vocational assessment report specifically indicated that Bosetti could perform all of the identified occupations "using her transferable work skills," and it is therefore likely that the SVP requirements for the identified occupations could be satisfied by the years Bosetti performed her prior occupations. In any event, the vocational assessment report also indicated that Bosetti could perform any of three occupations *she had previously performed*; clearly, no additional training would be necessary for these occupations.

[7] The letter also quoted the two-year limitation on mental disability benefits.

### 7. *Reconsideration Leads to a Second Denial*

Bosetti wrote back, requesting that her file be reopened. She submitted a letter from her chiropractor, Dr. Natacha D. Nelson, listing restrictions that should be imposed on Bosetti upon her return to the workplace. These restrictions did not substantially differ from the recommendations in the FCE report. Dr. Nelson would later testify, somewhat ambiguously, that she believed Bosetti to be totally disabled. Recognizing that it would be inconsistent to state that Bosetti is totally disabled and that she could work with restrictions imposed, Dr. Nelson explained that she set out the restrictions only because she thought Bosetti was going to return to work for a trial period to determine whether she was still disabled.

On June 6, 2005, Dr. Lebron-Caine wrote a letter stating that Bosetti has "multiple disabling medical problems. She has generalized body pain secondary to fibromyalgia. She also has chronic low back pain syndrome and osteopenia. Her chronic pain has contributed to insomnia, depression and fatigue." A June 13, 2005 letter from Terry Davis, Ph.D., Bosetti's psychologist, states, "The etiology of [Bosetti's] depression appears to be from chronic pain and loss of her ability to engage in her usual activities—work, recreational and personal." In other words, while it had appeared to Dr. Lebron-Caine in February 2003 that Bosetti's physical impairment was caused by her depression, it now appeared that her depression was caused by physical pain.

Keenan reopened Bosetti's claim, but on August 3, 2005, confirmed the initial denial. Keenan explained that the claim was originally denied because Bosetti had reached the two-year limitation on mental disability payments. Keenan further stated that, although Bosetti was experiencing physical pain, Bosetti was not totally disabled by her back pain and fibromyalgia. Keenan had sent Bosetti's file for review by an independent physician consultant, who agreed that Bosetti was not totally physically disabled from working, and that the restrictions suggested by the FCE report and by Dr. Nelson were sufficient. Keenan had also obtained an addendum to the vocational assessment report, in which a vocational expert agreed that, in light of the restrictions identified by the independent physician consultant, the six additional occupations identified in the vocational assessment report still remained "viable return-to-work situations."[8]

---

[8] For some reason, the vocational expert was not asked to comment on the viability of Bosetti's prior occupations as return-to-work options. However, as each of those prior occupations was identified as requiring sedentary duty only, it is apparent that they would still remain viable under the vocational expert's analysis.

### 8. *Bosetti Files Suit*

On July 16, 2006, Bosetti brought the instant action against U.S. Life, PVSD, and Keenan, seeking additional disability insurance payments. She alleged six causes of action: (1) Breach of the insurance contract, against U.S. Life and PVSD, alleging that Bosetti was a third party beneficiary of the insurance contract between U.S. Life and PVSD, and that her payments were improperly cut off after two years. Bosetti sought the unpaid disability benefits from both defendants. (2) Breach of the implied covenant of good faith and fair dealing (bad faith) against U.S. Life and PVSD, for wrongfully limiting the applicable coverages, unreasonable investigation of the claim, and failing to consider Bosetti's interests on a par with theirs. (3) Breach of contract, against PVSD and Keenan, alleging that Keenan had an oral contract with PVSD "to advise and procure long-term disability insurance for the benefit of [Bosetti]" and that Keenan and PVSD were thereby obligated to "review and analyze the coverage [provided] to be certain that [Bosetti] had the best and most complete coverage" and "to tell [her] if additional insurance was necessary, and to recommend other coverage, if needed or available, from other sources, if that would be necessary to protect [Bosetti] in the event [she] became disabled as alleged." (4) Intentional misrepresentation, against all three defendants, for promising without the intent to perform that U.S. Life would pay according to the policy. (5) Intentional infliction of emotional distress, against all three defendants, for terminating benefits when they knew Bosetti was still eligible and suffering. (6) Declaratory relief against U.S. Life and PVSD, seeking a declaration that Bosetti is entitled to further disability payments. Bosetti sought compensatory damages in the amount of unpaid disability benefits, emotional distress damages, and punitive damages.

### 9. *Keenan Successfully Demurs*

Keenan demurred, on the basis that it was not a party to any contract of insurance, but was only a third party claims administrator who owed no obligation to Bosetti. On December 18, 2006, the trial court sustained Keenan's demurrer without leave to amend. A judgment of dismissal, however, was not entered in favor of Keenan until March 21, 2008.

### 10. *PVSD Moves for Summary Judgment; U.S. Life Moves for Summary Adjudication*

On June 8, 2007, PVSD moved for summary judgment on the basis that it had breached no contract with Bosetti. PVSD argued that it had performed every act necessary to keep the policy in effect, and that Bosetti had not alleged otherwise. Bosetti never filed an opposition to PVSD's motion for summary judgment.

On June 15, 2007, U.S. Life moved for summary adjudication of Bosetti's cause of action for bad faith and her claim for punitive damages. U.S. Life argued that there is no bad faith when there is a genuine dispute regarding coverage. U.S. Life stated that such a dispute existed here, as it had properly relied on the opinion of experts that Bosetti was not disabled from any occupation at the end of two years.

There were several continuances of the hearing on PVSD's motion for summary judgment and U.S. Life's motion for summary adjudication. Prior to the time the hearing was held, U.S. Life moved for summary judgment.

### 11. *U.S. Life Moves for Summary Judgment*

U.S. Life's motion, filed on October 25, 2007, argued that, regardless of any dispute regarding whether Bosetti was totally physically disabled at the time benefits were terminated, benefits were properly terminated under the clause limiting benefits for mental or emotional disorders to two years. This was so, U.S. Life argued, because Bosetti's physical disability did not arise prior to March 3, 2003, when her employment—and therefore her coverage—terminated.

Bosetti opposed U.S. Life's motion on the basis that her physical disability had, in fact, exist prior to March 3, 2003. She relied, in part, on Dr. Lebron-Caine's February 24, 2003 attending physician's statement indicating both a mental, and a physical, impairment.

Bosetti also requested a continuance of the hearing date of U.S. Life's summary judgment motion; she did not request a continuance of the hearing date of PVSD's summary judgment motion, which was scheduled for the same day. Bosetti had obtained an internal document from DRMS, apparently governing claims handling, dated March 30, 2005. The page stated, among other things, "Mental and Nervous Limitation: (ERISA[9] plans) If one of the principal manifestations or symptoms of the mental illness is a disabling physical symptom the insurer may not be able to apply the mental illness limitation. See 'M&N in the 9th Circuit' in the Claims Manual."[10] Bosetti's counsel filed a declaration in support of the request for a continuance, stating that counsel needed additional time to compel production of the full DRMS claims manual, and to depose adjusters from Keenan and DRMS with the claims manual.

---

[9] ERISA refers to the Employee Retirement Income Security Act of 1974. (29 U.S.C. § 1101 et seq.) Among other things, it protects employee access to employee welfare benefits such as health insurance. (3 Witkin, Summary of Cal. Law (10th ed. 2005) Agency and Employment, § 406, p. 505.)

[10] It is undisputed that ERISA did *not* apply to the policy here.

U.S. Life filed a reply memorandum in support of its motion for summary judgment, arguing that Dr. Lebron-Caine's failure to find Bosetti physically disabled prior to her employment termination was conclusive. U.S. Life also argued against the request for a continuance, suggesting that the continuances already granted would have been more than sufficient for necessary discovery and that Bosetti had been dilatory in attempting to obtain DRMS's claims manual and the adjusters' depositions.

On December 31, 2007, Bosetti's counsel filed a supplemental declaration in support of the request for a continuance, although, now, Bosetti's counsel argued that the request applied to PVSD's motion for summary judgment as well. Bosetti's counsel argued, "The discovery applies to both defendants because [Bosetti] is a third party beneficiary of the School Group disability policy in question, and played a role in the claims administration policies which led to the premature cut off of [Bosetti's] benefits." That same day, PVSD filed a notice of Bosetti's failure to oppose PVSD's motion for summary judgment.

### 12. *The Summary Judgment Hearing and Orders*

A hearing was held on both motions on January 3, 2008. At the hearing, PVSD's counsel noted there was no opposition to its summary judgment motion, and argued that there was no basis for PVSD to be held liable for any breaches of duty of U.S. Life or Keenan. At this point, *for the very first time*, Bosetti's counsel argued that, as Bosetti was a third party beneficiary of the contract between PVSD and U.S. Life, she could, upon U.S. Life's default, pursue PVSD for a *refund of premiums* based on PVSD's failure to obtain the full insurance which Bosetti had expected to receive. Bosetti's counsel cited some authority for this proposition. After the hearing, PVSD filed supplemental briefing on this newly raised theory of recovery. Subsequently, the trial court entered summary judgment for PVSD.

Summary judgment was also entered for U.S. Life. Judgment was entered on February 29, 2008, and notice of entry of judgment was served on March 17, 2008. As already noted, a judgment of dismissal in favor of Keenan was entered on March 21, 2008. On March 27, 2008, Bosetti filed a notice of appeal on a judicial council form. She indicated that she was appealing from the judgment entered on March 17, 2008. She checked the box indicating an appeal from a "[j]udgment after an order granting a summary judgment motion." She did not indicate, by name, date or type of judgment, the judgment of dismissal entered in favor of Keenan.

### 13. *PVSD Obtains Reasonable Attorney Fees*

■ Under Code of Civil Procedure section 1038, when a defendant in a case brought under the Tort Claims Act prevails on summary judgment, the

defendant may obtain all defense costs, including reasonable attorney fees, if the trial court determines the action was not brought in good faith and with reasonable cause. PVSD sought its defense costs under this statute. PVSD's counsel filed a declaration in support of the motion, stating that he had inquired of Bosetti's counsel as early as February 2007 why PVSD was named as a defendant, and Bosetti's counsel had never responded. Counsel also noted that Bosetti never responded to PVSD's motion for summary judgment in writing, but had simply argued that PVSD had an obligation to provide proper insurance. In opposition to this motion, Bosetti again argued that she could pursue PVSD for any portions of her salary that had been withheld as premiums for disability coverage. She also argued that PVSD had a right, if not a fiduciary obligation, to enforce U.S. Life's promise to pay benefits. After a hearing, the trial court concluded Bosetti's action was brought in bad faith against PVSD, and awarded PVSD the full amount of costs and fees sought, $83,545. Bosetti filed a timely notice of appeal from this order, and from the judgment in favor of PVSD.[11] As already indicated, we have consolidated the two appeals.

## ISSUES ON APPEAL

These consolidated appeals raise several issues which we address in this opinion. First, may Bosetti pursue a challenge to the judgment entered in favor of Keenan when she did not file any notice of appeal as to that defendant; second, may Bosetti rely, in opposition to the summary judgment entered in favor of PVSD, upon a theory of relief that she never alleged in her complaint; third, was PVSD properly awarded its costs and fees under Code of Civil Procedure, section 1038; fourth, did a triable issue of fact exist as to (1) whether Bosetti had a disability not subject to the mental disorder limitation at the time her employment was terminated, and (2) whether Bosetti remained fully disabled when benefits were terminated; fifth, did a genuine dispute exist as to the question of Bosetti's entitlement to further payments under U.S. Life's policy so as to preclude any claim of bad faith against U.S. Life; finally, does this record support causes of action for intentional misrepresentation or intentional infliction of emotional distress against U.S. Life.

## DISCUSSION

### 1. No Appeal of the Dismissal in Favor of Keenan

Upon our review of the record, we discovered the absence of a notice of appeal of the judgment in favor of Keenan, and sought additional briefing on

---

[11] The notice of appeal actually predated the entry of judgment in favor of PVSD. We treat it as filed immediately after entry of judgment. (Cal. Rules of Court, rule 8.104(e).)

the issue. Bosetti responded that, since she had designated the briefing on Keenan's demurrer for inclusion in the record on appeal from the judgment in favor of U.S. Life, her transcript designation should be construed as a notice of appeal. Bosetti relies on *Department of Industrial Relations v. Nielsen Construction Co.* (1996) 51 Cal.App.4th 1016 [59 Cal.Rptr.2d 785] for this proposition. The case is wholly distinguishable. In that case, appellant's counsel timely served respondent's counsel with a copy of the notice of appeal, and mistakenly believed that it had been filed with the trial court. In that belief, counsel designated a record for that appeal, including in the record designation the notice of appeal counsel believed had been filed. When the court clerk informed appellant's counsel that no notice of appeal had been filed, counsel immediately resubmitted the notice of appeal, but it was after the time to appeal had expired. (*Id.* at pp. 1023–1024.) The Court of Appeal denied a motion to dismiss the appeal on the basis that the record designation would be construed as a notice of appeal. The court relied on authority that a notice and demand for transcript, addressed to the clerk of court and indicating an intention to appeal, is a sufficient notice of appeal even without a separate "Notice of Appeal." (*Id.* at p. 1024.)

The designation of record in Bosetti's appeal of the summary judgment in favor of U.S. Life, however, does not indicate any intention to appeal the dismissal in favor of Keenan. While it is true that the designation of record includes the briefing on Keenan's demurrer, that, in itself, is not controlling. Indeed, the designation of record includes the briefing on PVSD's motion for summary judgment—that fact does not render it a notice of appeal of the judgment in favor of PVSD. We find even more significant the fact that Bosetti's designation of record omits the judgment of dismissal in favor of Keenan and the reporter's transcript of the hearing on Keenan's demurrer. The designation of record simply does not indicate or even suggest an intention to appeal the dismissal in favor of Keenan.

Bosetti also argues that her appellate case information statement, which was filed within the time for a notice of appeal, indicated that she wished to pursue an appeal of the judgment of dismissal in favor of Keenan in addition to the summary judgment in favor of U.S. Life. While this is true, the appellate case information statement is filed in the Court of Appeal, not the trial court, and simply cannot be construed as a notice of appeal. (Cal. Rules of Court, rule 8.100(a)(1) [notice of appeal "must" be filed in the superior court].)

It is true that a notice of appeal "must be liberally construed." (Cal. Rules of Court, rule 8.100(a)(2).) However, there is no construction under which a notice of appeal of a March 17, 2008 "[j]udgment after an order granting a summary judgment motion" can be construed as a notice of appeal of a

March 21, 2008 judgment of dismissal following an order sustaining a demurrer of *a different defendant*. We will therefore dismiss the purported appeal from the judgment entered in favor of Keenan.

### 2. *The Judgment and Fee Order in Favor of PVSD Were Correct*

We briefly review the procedural history involving PVSD. On July 16, 2006, Bosetti brought the instant action, naming PVSD in causes of action for breach of the insurance contract, bad faith, breach of an oral contract between Keenan and PVSD that allegedly required her employer to obtain appropriate insurance and advise her if she needed additional coverage, intentional misrepresentation (regarding U.S. Life's promise to pay), intentional infliction of emotional distress (for terminating benefits), and declaratory relief that further benefits were owed. The complaint sought, from PVSD, the unpaid disability benefits to which Bosetti argued she was entitled and emotional distress damages. PVSD sought summary judgment on the basis that *it* was not Bosetti's insurer, but only her employer, and that it had performed all necessary duties to keep the policy in effect. *Bosetti never filed written opposition to the summary judgment motion.* At the hearing on the summary judgment motion, Bosetti raised a new theory, arguing that, upon U.S. Life's default on the insurance contract with PVSD, she could obtain a return of the premiums she had paid PVSD to obtain the necessary insurance.

Leaving aside any questions as to the viability of this theory, one thing is clear: it was not pleaded in Bosetti's complaint. Bosetti never alleged a cause of action in which she sought the return of her insurance premiums.[12] "The complaint serves to delimit the scope of the issues before the court on a motion for summary judgment [citation], and a party cannot successfully resist summary judgment on a theory not pleaded." (*Whelihan v. Espinoza* (2003) 110 Cal.App.4th 1566, 1576 [2 Cal.Rptr.3d 883].) We therefore conclude Bosetti's theory was not cognizable. PVSD properly sought summary judgment with respect to all causes of action pleaded against it, and Bosetti has *never* made any argument—not in the trial court or on appeal[13]— that any cause of action she pleaded against PVSD was sufficient to survive summary judgment. The summary judgment in favor of PVSD must be affirmed.

---

[12] Although not before the trial court, PVSD has provided this court with a copy of Bosetti's government tort claim. As with her complaint, Bosetti's tort claim seeks loss of disability benefits and emotional distress damages, not the return of premiums paid.

[13] In her brief on appeal, Bosetti argues that the trial court erred in denying her request for a continuance. This argument is based on her theory that she may pursue PVSD for a return of premiums if it is determined that U.S. Life breached the insurance contract. As the theory is not cognizable, we need not consider the propriety of the trial court's ruling on the request for a continuance.

On appeal, Bosetti also briefly argues that the award of costs, including attorney fees, in favor of PVSD was error. To avoid an award of defense costs and fees under Code of Civil Procedure section 1038, the plaintiff must establish that the action was pursued *both* with reasonable cause and in good faith. (*Hall v. Regents of University of California* (1996) 43 Cal.App.4th 1580, 1585 [51 Cal.Rptr.2d 387].) The reasonable cause issue is determined as a matter of law. The question is whether any reasonable attorney would have thought the claim tenable based on the facts known to the plaintiff and her attorney. As that issue is determined as a matter of law, it is reviewed on appeal de novo. (*Id.* at p. 1586.) The good faith determination, however, involves a factual inquiry into the plaintiff's state of mind. As it is a factual issue, it is reviewed on appeal for sufficiency of the evidence. (*Ibid.*)

Bosetti argues that, as a matter of law, "the action was reasonable and in good faith" because, she "had the absolute right to bring the action against [PVSD] as the promisee under the insurance contract between [PVSD] and U.S. Life." We disagree; even if Bosetti had the right to bring such an action for return of premiums, that is not the action Bosetti brought. Bosetti pursued her *employer* for *unpaid benefits* under a group disability policy the employer had obtained. No reasonable attorney could have believed that Bosetti had a tenable claim against her employer for benefits denied by her disability insurer simply on the basis that the employer had obtained the insurance. This is sufficient to demonstrate that there was no reasonable cause for complaint against PVSD. Thus, the trial court's order under Code of Civil Procedure section 1038 must be affirmed.

PVSD seeks attorney fees for Bosetti's pursuit of a frivolous appeal. We have no need to reach or discuss that issue. Awards of costs and attorney fees under Code of Civil Procedure section 1038 include costs and fees incurred defending the judgment on appeal, even when the appeal was not frivolous. (*Gonzales v. ABC Happy Realty, Inc.* (1997) 52 Cal.App.4th 391 [60 Cal.Rptr.2d 566].) We will therefore remand to allow PVSD to seek costs and fees on appeal from the trial court under section 1038.

### 3. *Bosetti Has a Viable Breach of Contract Claim Against U.S. Life*

U.S. Life obtained summary judgment on the basis that Bosetti did not have a physical disability prior to the termination of her employment on March 3, 2003. As U.S. Life had no obligation to pay for a mental or emotional disability beyond two years, the absence of a physical disability during the policy period was considered dispositive.

The issue in this case, however, is somewhat more complex, as Bosetti offered evidence indicating that her disability had both mental and physical

elements. Dr. Lebron-Caine's February 24, 2003 attending physician's statement reflects a Class 5 physical impairment secondary to Bosetti's severe depression—raising the issue of a physical disability arising from an emotional one. The June 2005 letters from Dr. Lebron-Caine and Dr. Davis indicate that Bosetti suffered from depression arising from her chronic pain—raising the issue of an emotional disability arising from a physical one. We therefore must determine to what extent, if any, the policy language limiting to two years the payments for a "[t]otal [d]isability . . . due to a mental, nervous or emotional disorder," applies to a disability that is not *entirely* mental. We sought additional briefing from the parties on this issue.

■ "Where a case turns on the interpretation of an insurance policy, the court reviews the policy's terms under the ordinary rules of contract interpretation. [Citation.] If the policy language is clear and explicit, it governs. [Citation.] If the policy terms are ambiguous or uncertain, the court must attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. [Citation.] If this rule does not resolve the ambiguity, it must be resolved against the insurer. [Citation.] [¶] In determining whether an ambiguity exists, the words of the policy must be interpreted according to the plain meaning that a layman would ordinarily attach to them. [Citation.] Policy language is ambiguous when it *reasonably* may be interpreted in two or more ways. [Citation.] 'Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists.' [Citation.] Moreover, the language must be interpreted in the context of the policy as a whole, and in light of the circumstances of the case. It cannot be deemed to be ambiguous in the abstract. [Citation.]" (*Mercury Ins. Co. v. Pearson* (2008) 169 Cal.App.4th 1064, 1070 [87 Cal.Rptr.3d 310].)

Here, the policy language limits to two years payments for a "[t]otal [d]isability . . . due to a mental, nervous or emotional disorder." There is no further definition in the policy of "mental, nervous or emotional disorder," nor, for that matter, of what it means for a disability to be "due to" such a disorder. It is clear that this language limits payments when the insured's total disability is *wholly* due to a mental, nervous or emotional disorder. Similarly, it is clear that this language does not apply when the insured's total disability has no mental component whatsoever. However, the language does not clearly explain whether the limitation applies when the total disability is due in part to a mental, nervous or emotional disorder. The policy language can be interpreted to limit coverage when the total disability is *in any way* due to a mental disorder; alternatively, it can be interpreted to limit coverage only when the total disability is *solely* due to a mental disorder. Adding to the confusion, the issue of causation may be a factor. For example, the policy language could be read to limit coverage only when the disability is *caused by* a mental disorder, even if some of the symptoms caused by that mental disorder are physical. Alternatively, the focus may be on symptoms, and the

policy language is meant to limit coverage when the *disabling symptoms* are those of a mental disorder, even if the underlying cause may be physical. If the policy language is reasonably subject to these competing interpretations, it is ambiguous.

Many courts have struggled with interpreting similar clauses, and have reached differing results. Several Ninth Circuit Court of Appeals cases have concluded a mental disorder limitation is ambiguous, and therefore construed it in favor of coverage. In *Patterson v. Hughes Aircraft Co.* (9th Cir. 1993) 11 F.3d 948, the Ninth Circuit concluded that a limitation on benefits resulting from " 'mental, nervous or emotional disorders of any type,' " was ambiguous as to whether " 'mental . . . disorders' " referred to causes or symptoms, and whether a disability is mental when it results from a combination of physical and mental factors. (*Id.* at pp. 949–950.) The court resolved the ambiguity in favor of the insured, holding that the limitation on coverage did not apply if the insured's disability was caused, in any part, by his physical symptoms. (*Id.* at p. 950.) In *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Technology, Inc.* (9th Cir. 1997) 125 F.3d 794, the Ninth Circuit again concluded that a plan's limitation on coverage for disabilities " 'caused or contributed to' by a 'mental disorder' " was ambiguous as to whether the reference was to causes or symptoms. (*Id.* at pp. 796, 799.) The court adopted the reasonable interpretation in favor of coverage, and found the limitation to not apply when the insured's emotional symptoms had physical causes. (*Id.* at p. 799.) A similar conclusion was also reached in *Kunin v. Benefit Trust Life Ins. Co.* (9th Cir. 1990) 910 F.2d 534, in which the Ninth Circuit held a limitation on coverage for " 'mental illness[es]' " to be ambiguous, at least when applied to autism. (*Id.* at p. 541.) The Ninth Circuit is not alone in its determination of ambiguity. Several state courts have also agreed that mental disorder limitations which do not further define "mental disorder" are ambiguous. (See, e.g., *Elam v. First Unum Life Ins. Co.* (2001) 346 Ark. 291 [57 S.W.3d 165, 167–169] [extrinsic evidence gives rise to an ambiguity with respect to whether "mental illness" focuses on causes or symptoms]; *Heaton v. State Health Ben. Com'n* (1993) 264 N.J. Super. 141 [624 A.2d 69, 71–72] [a limitation on coverage for " 'expenses incurred because of mental illness or functional nervous disorders' " is ambiguous as to whether cause or treatment triggers the limitation].)

This is not the only view, however. The Eighth Circuit Court of Appeals has concluded that an illness with behavioral symptoms should be subject to the mental illness limitation on coverage, even if that illness was genetically or biologically caused. (*Brewer v. Lincoln Nat. Life Ins. Co.* (8th Cir. 1990) 921 F.2d 150, 152, 154.) The Eighth Circuit adopted this conclusion on the basis that a layman would construe the policy language in this manner, reasoning, "[t]he cause of a disease is a judgment for experts, while laymen know and understand symptoms. Laymen undoubtedly are aware that some mental

illnesses are organically caused while others are not; however, they do not classify illnesses based on their origins. Instead, laypersons are inclined to focus on the symptoms of an illness; illnesses whose primary symptoms are depression, mood swings and unusual behavior are commonly characterized as mental illnesses regardless of their cause."[14] (921 F.2d at p. 154.)

When we sought additional briefing from the parties on this issue, U.S. Life suggested that we adopt the rationale of *Equitable Life Assurance Society v. Berry* (1989) 212 Cal.App.3d 832, 835, 840 [260 Cal.Rptr. 819] (*Berry*), a California opinion concerned with an insured who was diagnosed with manic-depressive illness, a condition which has a chemical (physical) etiology, rather than a purely functional (mental) one. (*Id.* at pp. 835, 838.) The *Berry* court concluded, as a matter of law, that there was no coverage due to a disability policy's exclusion for " '[m]ental or nervous disorders' " and a health policy's limitation on benefits for treatment " 'for a neurosis, psycho-neurosis, psychopathy, psychosis, or mental or nervous disease or disorder of any kind,' " on the basis that these exclusions were unambiguous and referred solely to symptoms, rather than causes. (*Berry, supra,* 212 Cal.App.3d at pp. 835, 840.) We decline to follow *Berry* for two reasons: we disagree with its analysis and it appears to have been abrogated by statute.

The *Berry* court concluded that the "mental . . . disorder []" language of the policies was unambiguous as a layman would necessarily interpret the term to include manic-depression. It stated: "Plaintiff's expert described manic-depressive illness as a disorder of cognition and behavior, as psychosis characterized by delusions and hallucinations. Every reasonable layman would view a person manifesting such derangement as suffering from a mental disease. [¶] The policies here in question exclude all mental disease from coverage . . . regardless of whether the disability was caused by a chemical imbalance, a blow on the head, being frightened by a black cat, inability to cope or whatever. In the medical plan, the . . . limitation affects mental disease of *any* kind. In the disability policy, mental disorders are expressly 'not covered.' Period. The language of either policy is simply not susceptible of the construction that only functionally but not organically caused mental illnesses are excluded. Manifestation, not cause, is the yardstick." (*Berry, supra,* 212 Cal.App.3d at p. 840.)

The *Berry* court stated that its result was reinforced by Insurance Code section 10125, a statute which mandates group disability insurance policies offer coverage "for expenses incurred as a result of mental or nervous disorders," but allows that coverage to be provided on different terms than

---

[14] Another court, criticizing the Eighth Circuit's opinion, stated, "It is hard to say how the court came to that conclusion [regarding the thought processes of laymen], except perhaps by intuition." (*Heaton v. State Health Ben. Com'n, supra,* 624 A.2d at p. 73, fn. 3.)

other disability coverage. The *Berry* court reviewed the legislative history of this statute, and noted that "nowhere in the proceedings dealing with the original bill or [its] amendments is there the slightest intimation that a distinction is made for any purpose between organically and functionally caused mental illnesses. Indeed, in every word of commentary by legislators or addressed to them, all mental disorders are treated alike." (*Berry, supra*, 212 Cal.App.3d at p. 841.)

The *Berry* court was apparently unaware that, during the exact timeframe it was resolving this issue, the Legislature was considering a bill to treat biogenetically caused mental disorders differently from functionally caused mental disorders in the context of disability insurance. On March 9, 1989, Assemblymember Bruce Bronzan, the chair of the Assembly Health Committee, introduced Assembly Bill No. 1692 (1989–1990 Reg. Sess.), with the cooperation of the California Psychiatric Association. The purpose of the bill was to require disability carriers to cover organically based mental illnesses on the same terms as physical illnesses. The rationale for the bill was that "[a]lthough brain research now indicates the biological and biogenetic bases of certain severe forms of mental illness, insurance policies continue to treat them as traditional behavior-based mental disorders."[15] (Assem. Com. on Finance and Ins., background information request for Assem. Bill No. 1692 (1989–1990 Reg. Sess.).) Assembly Bill No. 1692 was intended to "[e]stablish[] parity between biologically based severe mental disorders and other medically based disorders of a physical nature for the purpose of treatment under group health insurance coverage." (Sen. Ins., Claims and Corps. Com., Rep. on Assem. Bill No. 1692 (1989–1990 Reg. Sess.) Aug. 23, 1989.)

While this was the original intent of the bill, the statute ultimately enacted in 1989 might not have had the intended result. The original language proposed by Assemblymember Bronzan would have required genetically based severe mental illnesses to receive the same coverage as "disorders of the brain." (Assem. Bill No. 1692 (1989–1990 Reg. Sess.) § 1.) However, the bill was ultimately amended to provide that insurers must provide coverage for the identified mental illnesses[16] "subject to the same terms and conditions

[15] The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV) itself carries the following disclaimer: " 'Although this volume is titled The Diagnostic and Statistic[al] Manual of Mental Disorders, the term mental disorder unfortunately implies a distinction between 'mental' disorders and 'physical' disorders that is a reductionistic anachronism of mind/body dualism. A compelling literature documents that there is much 'physical' in 'mental' disorders and much 'mental' in 'physical' disorders. The problem raised by the term 'mental' disorders has been much clearer than its solution, and, unfortunately, the term persists in the title of the DSM-IV because we have not found an appropriate substitute.' " (*Elam v. First Unum Life Ins. Co., supra*, 57 S.W.3d at p. 168.)

[16] The scope of the bill was limited, by this amendment, to certain itemized biologically caused mental disorders.

applied to other mental disorder coverage." (Sen. Amend. to Assem. Bill No. 1692 (1989–1990 Reg. Sess.) Aug. 30, 1989.) Since Insurance Code section 10125 permitted insurers to offer reduced coverage for mental disorders, it is not clear whether Assembly Bill No. 1692, as amended, was intended to require insurance companies to treat biologically caused mental disorders any differently from other mental disorders. The legislative history is in disagreement on the matter. While one enrolled bill report took the position that the amended bill required no additional coverage for biologically based mental disorders (Cal. Dept. of Finance, Enrolled Bill Rep. on Assem. Bill No. 1624 (1989–1990 Reg. Sess.) Sept. 18, 1989), others understood the amended bill as providing that biologically based mental disorders must receive the same coverage as other physical disorders (Cal. Health & Welf. Agency, Enrolled Bill Rep. on Assem. Bill No. 1624 (1989–1990 Reg. Sess.) Sept. 15, 1989; Public Employees' Retirement System, Enrolled Bill Rep. on Assem. Bill No. 1624 (1989–1990 Reg. Sess.) Sept. 15, 1989). Indeed, when Assemblymember Bronzan wrote the Governor urging him to sign the bill, Assemblymember Bronzan explained, "The bill would simply require that schizophrenia, schizo-affective disorders, bipolar and delusional depressions, and pervasive developmental disorders be covered under the major medical benefits because we now know that these disorders are in fact biologically based." (Assemblymember Bronzan, letter to Governor Deukmejian, Sept. 19, 1989.)

The bill was enacted, as amended, as Insurance Code section 10123.15. Regardless of the meaning of the statutory language enacted, any confusion was removed when Insurance Code section 10123.15 was amended in 1992. The amendment struck the language requiring coverage on the same terms as applied to "other mental disorder coverage" and returned to the originally proposed language requiring coverage on the same terms as "other disorders of the brain." (Stats. 1992, ch. 462, § 1, p. 1836.) Insurance Code section 10123.15 currently provides, in pertinent part, "Every group policy of disability insurance which covers hospital, medical, and surgical expenses on a group basis, and which offers coverage for disorders of the brain shall also offer coverage in the same manner for the treatment of the following biologically based severe mental disorders: schizophrenia, schizo-affective disorder, bipolar disorders and delusional depressions, and pervasive developmental disorder. Coverage for these mental disorders shall be subject to the same terms and conditions applied to the treatment of other disorders of the brain . . . ."

■ It is our view that the holding of *Berry* does not survive Insurance Code section 10123.15. *Berry*'s conclusion that manic-depressive illness is subject to a disability policy's exclusion for " '[m]ental or nervous disorders' " has been abrogated by Insurance Code section 10123.15's requirement

that disability policies provide the same coverage for bipolar disorders as for other disorders of the brain.[17] (*Berry, supra,* 212 Cal.App.3d at p. 835.)

We are thus left with (1) a potentially ambiguous policy term; (2) several courts, like the Ninth Circuit, which believe the term "mental disorder" is ambiguous and may refer to causes, symptoms, or a combination of the two; and (3) a California statute which requires several specifically identified biogenetically caused mental disorders to receive the same coverage as other physical illnesses, regardless of their behavioral symptoms.

The issue of what constitutes a "mental illness" or "mental disorder" is one that is evolving. It is now understood that autism, although once thought to be primarily psychiatric in origin, is, in fact, organically based. (*Kunin v. Benefit Trust Life Ins. Co., supra,* 910 F.2d at p. 535.) Indeed, the Legislature has recognized, in its enactment of Insurance Code section 10123.15, that several itemized severe mental illnesses are, in fact, "biologically based," and should be treated as physical. Given the Legislature's focus on causation, we certainly cannot hold that an interpretation of "mental disorder" which focuses only on a disorder's symptoms is the *sole reasonable interpretation* of that term. At the same time, we cannot hold that a focus only on a disorder's origin is the sole reasonable means of interpretation either. In enacting Assembly Bill No. 1692 (1989–1990 Reg. Sess.), the Legislature rejected language which would have required that *all* biologically or biogenetically caused severe mental illnesses must be treated as physical disorders for the purpose of disability insurance, and chose instead to protect only a few itemized disorders. This suggests the Legislature believed that treating *other* biologically or biogenetically caused mental disorders as mental illnesses for the purpose of disability insurance is, at the very least, reasonable. Thus, the limitation in U.S. Life's policy for a "[t]otal [d]isability . . . due to a mental, nervous or emotional disorder" is ambiguous when considered with respect to a biologically caused mental disorder not provided for in Insurance Code section 10123.15.

■ However, in this case, we are not concerned with a *single* biologically caused disorder with mental symptoms. We are concerned with the situation where a physical event, disabling on its own, additionally causes mental symptoms, or the converse. The physical ailment of a heart attack may cause the mental symptom of depression (*Johnson v. General American Life Ins. Co.* (W.D.Va. 2001) 178 F.Supp.2d 644, 648–649); the mental disorder of anorexia nervosa may cause the physical symptoms of malnutrition and hypotension (*Simons v. Blue Cross and Blue Shield of Greater New York* (N.Y.App.Div. 1989)

---

[17] We note that the Legislature did not expressly address *Berry* in its enactments; and we appear to be the first court to address Insurance Code section 10123.15 in a published opinion. Thus, there is no reason to conclude that U.S. Life's counsel should have been aware that the case had been abrogated.

144 A.D.2d 28 [536 N.Y.S.2d 431, 432–433]); and, as is particularly relevant to this case, the physical disease of fibromyalgia may cause the mental symptoms of depression and anxiety (*Lang v. Long-Term Disability Plan of Sponsor Applied Remote Technology, Inc., supra,* 125 F.3d at p. 796). When mental symptoms arise from a separate physical causal event, or physical symptoms arise from a separate mental causal event, we believe the term "mental disorder" (absent a dispositively precise definition in the policy) is necessarily ambiguous.

As the term is ambiguous, we must determine whether coverage is consistent with the insured's reasonable expectations. In this case, we ask whether it is reasonable to expect disabling depression arising from fibromyalgia and other physical causes to not be subject to the mental disorder limitation in the policy. We also ask whether it is reasonable to expect disabling physical symptoms arising from depression to not be subject to the mental disorder limitation in the policy. We agree with the Ninth Circuit that the answer to both questions is yes. If Bosetti's disability was caused solely by depression and her fibromyalgia and other physical problems are neither a cause nor a symptom, the limitation applies. However, if her physical problems contributed to the disability or were a cause or symptom, the limitation does not apply. (See *Patterson v. Hughes Aircraft Co., supra,* 11 F.3d at p. 951.)

We now turn to the motion for summary judgment at issue on appeal. " 'A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail.' [Citation.] The pleadings define the issues to be considered on a motion for summary judgment. [Citation.] As to each claim as framed by the complaint, the defendant must present facts to negate an essential element or to establish a defense. Only then will the burden shift to the plaintiff to demonstrate the existence of a triable, material issue of fact. [Citation.]" (*Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 252 [38 Cal.Rptr.2d 65].) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) We review orders granting or denying a summary judgment motion de novo. (*FSR Brokerage, Inc. v. Superior Court* (1995) 35 Cal.App.4th 69, 72 [41 Cal.Rptr.2d 404]; *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 579 [37 Cal.Rptr.2d 653].) We exercise "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law." (*Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222 [38 Cal.Rptr.2d 35].)

While U.S. Life presented evidence that Bosetti did not suffer from a nonmental disability prior to the termination of her employment on March 3, 2003, Bosetti presented substantial evidence that she did. This evidence included (1) Bosetti's January 30, 2003 claim form, including "pain— headache pain—increased fibromyalgia pain in muscles in whole body" among her initial symptoms; (2) Dr. Lebron-Caine's February 24, 2003 attending physician's statement indicating a Class 5 physical impairment, constituting a "[s]evere limitation of functional capacity"; (3) Keenan's initial decision to inquire of Bosetti whether her disability was purely mental or also physical, based on the information Keenan then possessed; (4) Dr. Lebron-Caine's referral of Bosetti to a fibromyalgia specialist in April 2003; (5) X-rays and MRI's which ultimately revealed degenerative disk disease and herniated disks; (6) Bosetti's testimony that her orthopedic physicians agreed that she likely had degenerative disk disease prior to January 2003; and (7) Bosetti's testimony that her depression was *always* the result of her physical pain. This evidence, if believed, is sufficient to establish that Bosetti suffered from a nonmental disability within the policy period. Indeed, the fact that, in early 2005, Keenan required Bosetti to perform the FCE implies that Keenan itself believed that the disability claim on which it was making payments to Bosetti had a covered physical element.

Similarly, while U.S. Life presented evidence to the contrary, there is also sufficient evidence which, if believed, would establish that Bosetti remained totally disabled from any occupation at the time benefits were terminated. Although Dr. Nelson recommended restrictions to be followed for Bosetti's safety in the event she attempted to return to work, Dr. Nelson believed Bosetti to be totally disabled from her job or any other, at the time benefits were terminated. Moreover, Dr. Lebron-Caine and Dr. Davis indicated the existence of an emotional component to Bosetti's disability, which was not considered in U.S. Life's determination of whether Bosetti had been capable of returning to work at the end of two years. As we have concluded the mental disorder limitation does not apply if Bosetti's disability also had a physical element, Bosetti has raised a triable issue of fact as to whether her depression symptoms must also be considered in determining whether she remained disabled at the end of two years.[18]

Thus, a triable issue of fact exists as to whether Bosetti's benefits were properly terminated. Bosetti should be permitted to pursue her breach of

---

[18] We note, however, that an additional complication exists because Bosetti suffered a physical injury—a fall—after the policy had terminated. Bosetti cannot obtain benefits to the extent that her disability is attributable to a condition that did not exist during the policy period. She therefore must establish the existence of a disability which is not totally mental *arising during the policy period* and that the *same conditions* caused her total disability at the time benefits were terminated.

contract and declaratory relief causes of action, and summary judgment with respect to those counts was error.

### 4. U.S. Life Is Entitled to Summary Adjudication on Bosetti's Bad Faith Cause of Action

Bosetti alleged a cause of action for bad faith against U.S. Life, on the bases that U.S. Life (1) falsely asserted that she did not have a qualifying physical disability and was only entitled to receive payments for a mental disability; (2) unreasonably investigated her claim by failing to consider her physical symptoms in addition to her mental ones; and (3) failed to consider her interests on a par with its own, by classifying her claim as one subject to the mental disability limitation. In short, Bosetti's bad faith cause of action was based on the proposition that U.S. Life was at all times aware that her claim incorporated elements of physical disability, but wrongfully treated her claim as one for mental disability in order to take advantage of the two-year limitation on mental disability claims. U.S. Life sought summary adjudication of this cause of action on the basis of the "genuine dispute" doctrine.[19]

■ The term "bad faith," as used in the context of an insured's claim against his or her insurer, is simply a shorthand reference to a claimed breach by the insurer of the covenant of good faith and fair dealing that is implied in every contract of insurance. (See *Archdale v. American Internat. Specialty Lines Ins. Co.* (2007) 154 Cal.App.4th 449, 466 [64 Cal.Rptr.3d 632].) "Every contract imposes on each party an implied duty of good faith and fair dealing. [Citation.] Simply stated, the burden imposed is ' "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." ' [Citation.] Or, to put it another way, the 'implied covenant imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose.' [Citations.] A ' "breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself," and it has been held that " '[b]ad faith implies unfair dealing rather than mistaken judgment. . . .' [Citation.]" [Citation.]' " (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 345 [108 Cal.Rptr.2d 776] (*Chateau Chamberay*).)

In order to "fulfill its implied obligation, an insurer must give at least as much consideration to the interests of the insured as it gives to its own interests. When the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability [for bad faith]. And an

---

[19] As the trial court ultimately granted summary judgment in favor of U.S. Life, it did not reach the issue of the applicability of the genuine dispute doctrine. There is no suggestion that we cannot resolve this issue for the first time on appeal.

insurer cannot *reasonably and in good faith* deny payments to its insured without fully investigating the grounds for its denial. [Citation.]" (*Frommoethelydo v. Fire Ins. Exchange* (1986) 42 Cal.3d 208, 214–215 [228 Cal.Rptr. 160, 721 P.2d 41], italics added.)

 Defining good faith and fair dealing "has not always proven an easy task." (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 372 [6 Cal.Rptr.2d 467, 826 P.2d 710].) The issue has arisen as to whether the duty of good faith, which has been said to require the insurer to act "reasonably and in good faith," includes an element of subjective good faith in addition to objective reasonability. As early as 1978, our Supreme Court stated that, in the context of insurance bad faith, "[t]he terms 'good faith' and 'bad faith' . . . are not meant to connote the absence or presence of positive misconduct of a malicious or immoral nature—considerations which . . . are more properly concerned in the determination of liability for *punitive* damages. . . . 'Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes [from consideration] a variety of types of conduct characterized [in other contexts] as involving "bad faith" because they violate community standards of decency, fairness or reasonableness.' [Citation.]" (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 921–922, fn. 5 [148 Cal.Rptr. 389, 582 P.2d 980], original italics.)

Subsequent case law has confirmed that "the covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive." (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc., supra,* 2 Cal.4th at p. 373.) Indeed, " '[t]he ultimate test of [bad faith] liability in . . . first party [insurance] cases is whether the refusal to pay policy benefits was *unreasonable.*' " (*Opsal v. United Services Auto. Assn.* (1991) 2 Cal.App.4th 1197, 1205 [10 Cal.Rptr.2d 352], original italics.) In other words, an insured plaintiff need only show, for example, that the insurer unreasonably refused to pay benefits or failed to accept a reasonable settlement offer; there is no requirement to establish *subjective* bad faith. (See CACI No. 2331 [first party bad faith]; CACI No. 2334 [third party bad faith]; see also *McCoy v. Progressive West Ins. Co.* (2009) 171 Cal.App.4th 785, 794 [90 Cal.Rptr.3d 74].)

 Not only is subjective bad faith *unnecessary* to establish a bad faith cause of action, it is also *insufficient* to do so. "If the conduct of the insurer in denying coverage was objectively reasonable, its subjective intent is irrelevant." (*CalFarm Ins. Co. v. Krusiewicz* (2005) 131 Cal.App.4th 273, 287 [31 Cal.Rptr.3d 619]; see *Morris v. Paul Revere Life Ins. Co.* (2003) 109 Cal.App.4th 966, 973 [135 Cal.Rptr.2d 718] [triable issues of fact regarding

the insurer's subjective intent cannot defeat summary judgment in favor of the insurer in a bad faith action when the insurer's conduct was objectively reasonable as a matter of law].) Thus, while bad faith cases speak in terms of a duty to act reasonably *and* in good faith (see, e.g., *Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 723 [68 Cal.Rptr.3d 746, 171 P.3d 1082] (*Wilson*); *Frommoethelydo v. Fire Ins. Exchange, supra*, 42 Cal.3d at pp. 214–215; *Chateau Chamberay, supra*, 90 Cal.App.4th at pp. 348–349), the standard by which the claims handling activities of the insurer will be judged is clear. If an insurer is to avoid liability for bad faith, its actions and position with respect to the claim of an insured, and the delay or denial of policy benefits, must be "founded on a basis that is *reasonable under all the circumstances.*" (*Wilson, supra*, 42 Cal.4th at p. 724, fn. 7, italics added.) This is an *objective* standard.

■ " '[A]n insurer denying or delaying the payment of policy benefits due to the existence of a *genuine dispute* with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract.' [Citation.]" (*Wilson, supra*, 42 Cal.4th at p. 723, italics added.)[20] This is known as the "genuine dispute" or "genuine issue" doctrine, and it enables an insurer to obtain summary adjudication of a bad faith cause of action by establishing that its denial of coverage, even if ultimately erroneous and a breach of contract, was due to a genuine dispute with its insured. (*Chateau Chamberay, supra*, 90 Cal.App.4th at p. 347.) The dispute, however, must be *genuine*. An insurer cannot claim the benefit of the genuine dispute doctrine based on an investigation or evaluation of the insured's claim that is not full, fair and thorough. (*Id.* at pp. 348–349.) Nor may an insurer "insulate itself from liability for bad faith conduct by the simple expedient of hiring an expert for the purpose of manufacturing a 'genuine dispute.' " (*Id.* at p. 349, fn. 8.)

■ In *Wilson*, the Supreme Court emphasized that the genuine dispute rule does not "alter the standards for deciding and reviewing motions for summary judgment. 'The genuine issue rule in the context of bad faith claims allows a [trial] court to grant summary judgment when it is undisputed or

---

[20] As we recently explained in *Jordan v. Allstate Ins. Co.* (2007) 148 Cal.App.4th 1062 [56 Cal.Rptr.3d 312], "[b]efore an insurer can be found to have acted in bad faith for its delay or denial in the payment of policy benefits, it must be shown that the insurer acted *unreasonably* or *without proper cause*. Where there is a *genuine issue* as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute. [Citation.] Moreover, it must be remembered that 'an insurer is not required to pay every claim presented to it. Besides the duty to deal fairly with the insured, the insurer also has a duty to its other policyholders and to the stockholders (if it is such a company) not to dissipate its reserves through the payment of meritless claims. . . .' [Citation.]" (*Id.* at p. 1072, original italics.)

indisputable that the basis for the insurer's denial of benefits was reasonable—for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law. [Citation.] . . . On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably.' [Citation.] Thus, an insurer is entitled to summary judgment based on a genuine dispute over coverage or the value of the insured's claim *only* where the summary judgment record demonstrates the absence of triable issues (Code Civ. Proc., § 437c, subd. (c)) as to whether the disputed position upon which the insurer denied the claim was reached reasonably and in good faith." (*Wilson, supra*, 42 Cal.4th at p. 724, italics added.)[21]

One recent opinion, however, appears to have suggested that an insurer cannot prevail on the genuine dispute doctrine unless it can establish *both* that its conduct was objectively reasonable *and* that its subjective intent was one of good faith. (*Brehm v. 21st Century Ins. Co.* (2008) 166 Cal.App.4th 1225, 1238 [83 Cal.Rptr.3d 410] (*Brehm*).) *Brehm* was concerned with an insured who claimed that her insurer had unreasonably investigated her uninsured motorist claim. The insurer had relied on its own medical examination of the insured plaintiff, which had concluded that she presented only " 'subjective complaints with no objective evidence of injury or problem.' " (*Id.* at p. 1239.) In her complaint, Brehm alleged that the doctor's "examination was a sham; that he was retained by [the insurer] with the intention he prepare a report that falsely minimized the seriousness of Brehm's injury precisely so that [the insurer] could argue there was a 'genuine dispute' as to the value of the claim; and that [the doctor] did exactly as he was expected to do." (*Ibid.*) The insurer demurred on the basis that its settlement offer to Brehm was objectively reasonable as a matter of law, as it was based on its doctor's evaluation, and the trial court agreed. The appellate court reversed, in part, on the basis that the insurer could not prevail without establishing *both* objectively reasonable conduct and good faith subjective intent. (*Brehm, supra*, 166 Cal.App.4th at p. 1238.) Thus, the availability of the genuine dispute doctrine was, in light of the allegations in Brehm's complaint, an issue that could not be resolved on demurrer. (*Id.* at p. 1240.)

If the *Brehm* court intended to hold that there is a distinct *subjective* good faith requirement necessary to an insurer's reliance on the genuine dispute doctrine, then we must disagree. As we discussed above, bad faith is to be

---

[21] "[T]he reasonableness of the insurer's decisions and actions must be evaluated as of the time that they were made; the evaluation cannot fairly be made in the light of subsequent events that may provide evidence of the insurer's errors." (*Chateau Chamberay, supra*, 90 Cal.App.4th at p. 347.)

determined solely by objective unreasonability.[22] Moreover, such a characterization of the doctrine of bad faith would be unnecessary to *Brehm*'s conclusion.[23] When an insurer is subjectively aware that it has hired a biased expert, it is simply not objectively reasonable to rely on that expert.[24] (*Chateau Chamberay, supra*, 90 Cal.App.4th at pp. 348–349.) In other words, while an insurer's subjective bad intentions are not a sufficient basis on which to establish a bad faith cause of action, an insurer's subjective mental state may nonetheless be a circumstance to be considered in the evaluation of the *objective* reasonableness of the insurer's actions.[25]

Turning to the circumstances of this case, which are not in dispute, U.S. Life sought summary adjudication on the basis that its denial of further benefits was based on a genuine dispute regarding whether Bosetti was totally physically disabled after two years. For the reasons discussed below, we agree that such a dispute existed.

First and foremost, U.S. Life assumed that Bosetti's mental symptoms were irrelevant to a determination of disability after two years of benefits. This position was supported by the holding in *Berry*. While we now express our disagreement with *Berry* (see Discussion, pt. 3 of this opinion, *ante*), we certainly cannot say that a disability insurer's reliance on the then sole California case to address the issue was in any way *unreasonable*. Indeed, such authority would have constituted a "proper cause" for the position taken by U.S. Life in this matter. (See *Opsal v. United Services Auto. Assn., supra*, 2 Cal.App.4th at pp. 1205–1206.) With respect to Bosetti's alleged physical symptoms, U.S. Life did not deny further benefits until it had obtained the FCE, which was designed to determine whether Bosetti was physically capable of working. It based its denial of coverage on the report of the FCE, indicating that Bosetti could function at a sedentary or light physical level

---

[22] We can envision the chaos which would follow if an insured could successfully sue an insurer for bad faith *even when the insurer had acted as an objectively reasonable insurer* simply because the insurer's motives were less than pure.

[23] *Bernstein v. Travelers Ins. Co.* (N.D.Cal. 2006) 447 F.Supp.2d 1100, 1114, reached a similar conclusion to *Brehm*. As discussed below, we believe that its result, too, can be harmonized without incorporating a subjective element into bad faith analysis.

[24] An insurer's subjective knowledge can be *relevant* to the objective determination of bad faith. (See, e.g., *Lipton v. Superior Court* (1996) 48 Cal.App.4th 1599, 1614 [56 Cal.Rptr.2d 341] [insurer's awareness of a claim for which a potential for coverage existed is relevant to a determination of whether its failure to defend was in bad faith]; *Bernstein v. Travelers Ins. Co., supra*, 447 F.Supp.2d 1100 [insurer's setting of reserves with respect to the insured's claim potentially may be relevant to a determination of whether its delay in paying the insured's full claim was in bad faith].)

[25] This was the sense in which we referred to the use of "evidence of motive, intent and state of mind" as relevant to the bad faith analysis in our decision in *Chateau Chamberay, supra*, 90 Cal.App.4th at page 350, and it is the sense in which we understood the cases cited in that opinion had utilized similar language.

with certain restrictions, and a vocational assessment indicating that, despite these physical restrictions, several types of work were available to Bosetti. When Bosetti challenged the validity of the FCE, U.S. Life (through its claims administrator, Keenan) immediately reopened the case and sent the file to an independent physician who reviewed the file in great detail, including the reports of all of Bosetti's treating physicians,[26] and concluded that the restrictions set forth in the FCE were appropriate. There is nothing in this record to suggest that U.S. Life's investigation into Bosetti's claim was in any way biased, inadequate, superficial or otherwise unworthy of reliance by an objectively reasonable insurer.[27] (See *Chateau Chamberay, supra*, 90 Cal.App.4th at pp. 348–349.) Thus, the evidence establishes a basis for a genuine dispute regarding Bosetti's eligibility for further benefits, and the *existence* of such a dispute is sufficient to defeat her bad faith claim. Bosetti has presented no evidence that would support a contrary conclusion.

Bosetti nonetheless does briefly raise two additional arguments in an attempt to save her bad faith cause of action; neither is viable. First, Bosetti points to U.S. Life's failure to notify her of the two-year limitation on mental disability payments when it first approved Bosetti's claim. While we agree that U.S. Life should have promptly notified Bosetti of the relevant policy provisions (see Cal. Code Regs., tit. 10, § 2695.4, subd. (a)), Bosetti makes no argument that U.S. Life's delay in informing her of this provision damaged her in any way. Thus, such failure on the part of U.S. Life cannot support a bad faith cause of action. Second, Bosetti argues that there is evidence of bad faith in the presumed fact that U.S. Life violated its own claims manual in handling her claim.[28] The argument is baseless. Bosetti relies on a single page from a DRMS document which states, "Mental and Nervous Limitation: (ERISA plans) If one of the principal manifestations or symptoms of the mental illness is a disabling physical symptom the insurer may not be able to apply the mental illness limitation. See 'M&N in the 9th

---

[26] The independent physician, Dr. Sharon Hogan, noted, "I cannot find radiologic confirmation that the insured has cervical and lumbar spondylosis with degenerative disc disease." Dr. Hogan indicated that even if there were such documentation, her conclusion would not change.

[27] Bosetti argues that the "failure to have [her] examined by [U.S. Life's] own doctors was unreasonable as a matter of law." This is a misstatement of California law. "An insurer's good or bad faith must be evaluated in light of the totality of the circumstances surrounding its actions. [Citations.] In some cases, review of the insured's submitted medical records might reveal an indisputably reasonable basis to deny the claim without further investigation." (*Wilson, supra*, 42 Cal.4th at p. 723.) Thus, U.S. Life's failure to have Bosetti examined by its own doctors, as opposed to an independent medical examination, was not, as a matter of law, unreasonable.

[28] Indeed, Bosetti's lead argument on appeal is that the trial court erred in denying her motion for a continuance so that she could develop this theory by obtaining the claims manual and deposing the adjusters with it. As this theory cannot support a bad faith cause of action, the trial court did not err in denying Bosetti a continuance to further develop it.

Circuit' in the Claims Manual." Even if Bosetti could establish that U.S. Life was bound by DRMS's claims manual, this document refers to "ERISA plans," and it is undisputed that the policy here was *not* an ERISA plan.[29] Bosetti cannot establish bad faith by U.S. Life's failure to comply with a clause that, by its terms, did not appear to apply to her claim.

Bosetti's arguments are not persuasive. While Bosetti can point to evidence that her benefits should not have been terminated, U.S. Life can point to evidence, as well as reliance on then existing California law, that the decision to effect such termination was reasonable and made with proper cause. While such conflicting evidentiary positions do present issues to be resolved in Bosetti's breach of contract cause of action, we have found nothing in the voluminous record on appeal which would support a jury's conclusion that the actions and decisions by U.S. Life were unreasonable. Thus, we conclude that a genuine dispute existed as to Bosetti's entitlement to extended benefits and U.S. Life is entitled to summary adjudication of Bosetti's bad faith cause of action.

### 5. *U.S. Life Is Entitled to Summary Adjudication of Bosetti's Intentional Tort Causes of Action*

Bosetti's cause of action for intentional misrepresentation based on allegations that U.S. Life never intended to perform the promises in its insurance policy has no merit. Bosetti has provided no evidentiary support for the proposition that U.S. Life did not intend to perform the promises in its policy.[30] Rather, the record demonstrates that U.S. Life only declined to pay *further* benefits based on a genuine dispute as to the facts and controlling law applicable to Bosetti's claim for an *extension* of benefits.

Similarly, Bosetti's cause of action for intentional infliction of emotional distress, based on allegations that U.S. Life wrongfully terminated benefits when it knew Bosetti was entitled to them, must also fail. " ' "The elements of a prima facie case for the tort of intentional infliction of emotional distress [are] . . . as follows: '(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard [for] the

---

[29] We assume that the language in the DRMS document referred to *Patterson v. Hughes Aircraft Co., supra,* 11 F.3d at pages 950–951, in which the Ninth Circuit held that a "mental disorder" limitation would not be applied if the insured's headaches were either a cause or a symptom of his depression. This case was a Ninth Circuit ERISA case, although this fact does not affect its analysis for our purposes (see discussion of ambiguity of policy language in pt. 3 of Discussion of this opinion, *ante*). There was nothing unreasonable in DRMS limiting this comment to ERISA or Ninth Circuit cases, as no California case or statute had addressed the legal issue arising from circumstances where a physical symptom resulted from a mental illness.

[30] As we have discussed, U.S. Life paid full benefits to Bosetti for a period of two years.

probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.' " [Citation.]' [Citation.]" (*Wilkins v. National Broadcasting Co.* (1999) 71 Cal.App.4th 1066, 1087 [84 Cal.Rptr.2d 329].) The conduct must be "so extreme and outrageous 'as to exceed all bounds of that usually tolerated in a civilized society.' " (*Ibid.*) Given the record in this matter and our conclusion that Bosetti and U.S. Life had a genuine dispute regarding coverage, there was no extreme and outrageous conduct here.

As U.S. Life is entitled to summary adjudication on all of Bosetti's tort causes of action, her claim for punitive damages must fail as well.

## CONCLUSION

There is evidence in this record supporting Bosetti's claim that, when her employment was terminated, she was totally disabled from "any employment" and that such disability had a physical component. If a trier of fact accepts such evidence, then she would be entitled to receive her extended benefits. There is also evidence in this record, however, developed by U.S. Life in what the record clearly shows to be a full, fair and thorough investigation, that Bosetti was capable of performing sedentary or light physical work, and was therefore not entitled to further benefits. This is a classic breach of contract case, and a jury should determine, after weighing all of the evidence, whether Bosetti was, in fact, entitled to additional benefits. Bosetti's breach of contract and declaratory relief causes of action should therefore proceed.

The tort claims, however, are without merit as a matter of law. This record demonstrates that there was a genuine dispute as to whether Bosetti was entitled to extended disability payments, precluding a finding that U.S. Life acted in bad faith. Bosetti's claims of intentional torts against U.S. Life likewise have no support in this record.

Also without merit are Bosetti's allegations that her *employer* was guilty of breach of contract and bad faith based on U.S. Life's failure to extend her benefits. Finally, she failed to notice an appeal from the judgment entered in favor of Keenan, the third party administrator.

## DISPOSITION

In No. B206896, to the extent Bosetti's appeal purports to challenge the dismissal in favor of Keenan, the appeal is dismissed for failure to file a notice of appeal. Keenan shall recover its costs on appeal. The judgment in

favor of U.S. Life is reversed; the matter is remanded to the trial court with directions to vacate its order granting summary judgment and enter a new order denying summary judgment but granting U.S. Life summary adjudication of Bosetti's causes of action for bad faith, intentional misrepresentation, and intentional infliction of emotional distress, as well as her claim for punitive damages. Bosetti and U.S. Life are to bear their own costs on appeal.

In No. B208835, the judgment and order of costs and attorney fees in favor of PVSD are affirmed. PVSD shall recover its costs on appeal. The matter is remanded to the trial court to consider and decide any motion that might be made by PVSD to recover any further appellate costs (including attorney fees) to which it may be entitled under Code of Civil Procedure section 1038.

Klein, P. J, and Aldrich, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 14, 2009, S175828.