Filed 6/27/16

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CLAYTON D. PASLAY et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> STATE FARM GENERAL INSURANCE COMPANY, <br><br> Defendant and Respondent. | B265348 <br> (Los Angeles County <br> Super. Ct. No. SC119432) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Nancy L. Newman, Judge. Reversed in part, affirmed in part, and remanded with directions.

Hart, Watters & Carter and Thomas L. Watters for Plaintiffs and Appellants.

LHB Pacific Law Partners, Clarke B. Holland, Matthew F. Batezel and Aparajito Sen, for Defendant and Respondent.

_____

\* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts D.1. and D.2.c. of the Discussion.

In the underlying action, appellants Clayton and Traute Paslay asserted claims for breach of insurance contract, bad faith, and elder abuse against respondent State Farm General Insurance Company (State Farm), and requested an award of punitive damages. The trial court granted summary adjudication in State Farm's favor on each claim and on the request for punitive damages. We conclude there are triable issues of fact regarding the claim for breach of insurance contract, but none regarding the other claims and the request for punitive damages. In the published portion of the opinion, we conclude that the bad faith claim fails under the genuine dispute doctrine, and that the evidence supporting the application of that doctrine precludes the existence of triable issues regarding the elder abuse claim. We therefore reverse the judgment solely with respect to the Paslays' claim for breach of insurance contract, affirm the trial court's remaining rulings, and remand the matter for further proceedings.

## RELEVANT FACTUAL AND
## PROCEDURAL BACKGROUND

The following facts are not in dispute: In December 2010, the Paslays' house in Pacific Palisades was insured under a homeowners policy issued by State Farm. On December 17, 2010, during a period of heavy rain, a roof drain failed, causing water to enter the house's master bedroom through the ceiling, and damage other parts of the house. The Paslays reported the incident to State Farm, which arranged for them to live in a rented residence while their house was being repaired. At the end of October 2011, the Paslays resumed living in their house. State Farm made payments under the policy exceeding $248,000, including $122,770.98 for repairs to the house, but denied coverage for certain items,

2

including work undertaken in the master bathroom, replacement of drywall ceilings, and installation of a new electrical panel.

In December 2012, the Paslays initiated the underlying action against State Farm. Their second amended complaint (SAC), filed January 15, 2014, contained claims for breach of an insurance contract and bad faith, alleging that State Farm had violated the policy in numerous ways, including refusing to pay for repairs to the master bathroom, refusing to pay for replacement of certain drywall ceilings and the electrical panel, and "[p]rematurely forcing [the Paslays] to move out of temporary rental housing." The SAC also contained a claim by Traute for elder abuse (Welf. & Inst. Code, §§ 15610.07, 15610.30) predicated on allegations that she was 80 years old when the house suffered water damage. In support of that claim, the SAC asserted that State Farm engaged in abuse by failing to pay policy benefits and forcing Traute to move back into the Paslays' house while it was still under construction. The complaint sought compensatory and punitive damages.

In November 2014, State Farm sought summary judgment or adjudication regarding the SAC. State Farm requested summary adjudication on the claims for breach of an insurance contract and bad faith, arguing that there were no triable issues whether it had provided all policy benefits due the Paslays. State Farm also argued that the bad faith claim failed under the "'genuine dispute'" doctrine for want of triable issues whether it acted unreasonably with respect to the Paslays' claim. In view of the purported defects in the claims for breach of an insurance contract and bad faith, State Farm contended that summary adjudication was proper with respect to the claim for elder abuse and the Paslays' request for punitive damages.

In granting summary judgment, the trial court concluded that summary adjudication was proper with respect to each claim in the SAC and the request for

3

punitive damages because there were no triable issues whether State Farm failed to pay benefits owed under the policy and forced the Paslays to move prematurely back to their house. On May 19, 2015, the court entered a judgment in favor of State Farm dismissing the entire action with prejudice. This appeal followed.

## DISCUSSION

The Paslays contend the trial court erred in granting summary judgment on the basis of the motions for summary adjudication. For the reasons explained below, we agree that summary adjudication was improper with respect to the SAC's claim for breach of insurance contract, but not with respect to the other claims and the request for punitive damages.

### A. *Standard of Review*

"A summary adjudication motion is subject to the same rules and procedures as a summary judgment motion. Both are reviewed de novo. [Citations.]" (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819.) "A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.]" (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107.) Generally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 850.) In moving for summary judgment, "all that the defendant need do is to show that the plaintiff cannot establish at least one element

4

of the cause of action -- for example, that the plaintiff cannot prove element X." (*Id.* at p. 853, fn. omitted.)

Although we independently assess the grant of summary judgment, our inquiry is subject to two constraints. Under the summary judgment statute, we examine the evidence submitted in connection with the summary judgment motion, with the exception of evidence to which objections have been appropriately sustained. (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 711; Code Civ. Proc., § 437c, subd. (c).) Here, State Farm raised numerous evidentiary objections to the showing proffered by the Paslays, which the trial court sustained in part and overruled in part. Because the Paslays do not challenge these rulings on appeal, our review is limited to the evidence considered by the trial court.

Furthermore, our review is governed by a fundamental principle of appellate procedure, namely, that "'[a] judgment or order of the lower court is presumed correct,"'" and thus, "'error must be affirmatively shown.'" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 664, italics omitted, quoting 3 Witkin, Cal. Procedures (1954) Appeal, § 79, pp. 2238-2239.) Under this principle, the Paslays bear the burden of establishing error on appeal, even though State Farm had the burden of proving its right to summary judgment before the trial court. (*Frank and Freedus v. Allstate Ins. Co.* (1996) 45 Cal.App.4th 461, 474.) For this reason, our review is limited to contentions adequately raised in the Paslays' briefs. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125-126.) Underlying all the claims asserted in the SAC are allegations that State Farm breached the insurance contract with respect to numerous losses related to the December 2010 rain water leak in the house. Because the Paslays' briefs discuss only a limited number of alleged losses, we confine our review to those.

5

B. *Policy Provisions*

The Paslays contend there are triable issues whether State Farm paid the policy benefits relating to the repair of the house, focusing primarily on work performed in the master bathroom, abatement of asbestos on the house's ceilings, and replacement of the electrical panel. In addition, they maintain there are triable issues regarding additional living expenses due under the policy. We begin by describing the policy provisions relevant to those contentions.

In Section I -- Losses Insured, the policy provides under Coverage A that State Farm insures "for accidental direct physical loss" to the pertinent dwelling, except as set forth in Section 1 -- Losses Not Insured. An endorsement concerning Coverage A further states that State Farm "will pay . . . the reasonable and necessary cost to repair or replace with similar construction and for the same use on the premises . . . the damaged part of the [covered] property . . . ."

The policy sets forth two pertinent limitations under Coverage A regarding (1) upgrades required by building ordinances or other laws and (2) mold-related costs. The endorsement described above states: "We will not pay increased costs resulting from enforcement of any ordinance or law regulating the construction, repair, or demolition of a building . . . , except as provided under Option OL -- Building Ordinance or Law Coverage [(Option OL)]." The endorsement contains Option OL, which states that (subject to restrictions not relevant here) when a dwelling is damaged by a "[l]oss [i]nsured," State Farm "will pay for the increased cost to repair or rebuild the physically damaged portion of the dwelling caused by the enforcement of a building, zoning or land use ordinance or law if *the enforcement is directly caused by the same* [*l*]oss [*i*]nsured and *the requirement is in effect at the time the* [*l*]oss [*i*]nsured occurs." (Italics omitted.) Option OL

6

further provides that under similar circumstances (that is, those described in the phrases italicized above), State Farm will pay for losses and "legally required" changes to undamaged portions of the dwelling resulting from the enforcement of an ordinance or law.[1]

Also included in the policy is an endorsement relating to "any type or form of fungi, including mold . . . ." The endorsement provides, inter alia, that under Section 1 -- Losses Not Insured, State Farm will not pay more than $5,000 "for all loss by fungus" to a dwelling subject to Coverage A "caused by or directly resulting from" a covered "peril," including "the cost of any testing or monitoring of . . . property to confirm the type, absence, presence or level of fungus."[2]

---

[1] The endorsement provides in pertinent part: "When the dwelling covered under Coverage A -- Dwelling is damaged by a Loss Insured we will also pay for: [¶] a. the cost to demolish and clear the site of the undamaged portions of the dwelling caused by the enforcement of a building, zoning or land use ordinance or law if the enforcement is directly caused by the same Loss Insured and the requirement is in effect at the time the Loss Insured occurs; and [¶] b. loss to the undamaged portion of the dwelling caused by enforcement of any ordinance or law if: [¶] (1) the enforcement is directly caused by the same Loss Insured; [¶] (2) the enforcement requires the demolition of portions of the same dwelling not damaged by the same Loss Insured; [¶] (3) the ordinance or law regulates the construction or repair of the dwelling, or establishes zoning or land use requirements at the described premises; and [¶] (4) the ordinance or law is in force at the time of the occurrence of the same Loss Insured; or [¶] c. the legally required changes to the undamaged portion of the dwelling caused by the enforcement of a building, zoning or land use ordinance or law if the enforcement is directly caused by the same Loss Insured and the requirement is in effect at the time the Loss Insured occurs."

[2] The mold endorsement states that the $5,000 coverage limitation for "loss by fungus" applies to "loss to all insured property, including all costs or expenses for: [¶] a. any loss of use or delay in rebuilding, repairing or replacing covered property, including any associated cost or expense, due to interference at the described premises or location of the rebuilding, repair or replacement of that

*(Fn. continued on next page.)*

7

In addition to the coverage for damage to the dwelling discussed above, the policy provides for additional living expenses. Under Coverage C, the policy states: "When a [l]oss [i]nsured causes the residence premises to become uninhabitable, we will cover the necessary increase in costs you incur to maintain your standard of living up to 24 months. Our payment is limited to incurred costs for the shortest of: (a) the time required to repair or replace the premises; (b) the time required for your household to settle elsewhere; or (c) 24 months."

C. *Underlying Proceedings*

We next examine the parties' showings, with special attention to the evidence bearing on the issues raised on appeal.

1. *State Farm's Evidence*

In seeking summary adjudication on the Paslays' claims, State Farm submitted evidence supporting the following version of the underlying events: On December 17, 2010, when rain water leaked through the ceiling of the house's master bedroom, Traute contacted Clayton, who was then in Texas. After reporting the loss to State Farm and arranging for temporary repairs, Clayton told

property, by fungus; [¶] b. any remediation of fungus, including the cost or expense to: [¶] (1) remove or clean the fungus from covered property or to repair, restore or replace that property; [¶] (2) tear out and replace any part of the building or the other property as needed to gain access to the fungus; [¶] (3) contain, treat, detoxify, neutralize or dispose of or in any way respond to or assess the effects of fungus; or [¶] (4) remove any property to protect it from the presence of or exposure to fungus; [¶] c. the cost of any testing or monitoring of air or property to confirm the type, absence, presence or level of fungus, whether performed prior to, during or after removal, repair, restoration or replacement of covered property." (Emphasis omitted.)

8

State Farm that his general contractor would prepare a damage estimate. State Farm assigned a field adjuster to the claim and hired Andrew Gillespie, a general contractor, to assist with its investigation.

On January 11, 2011, the house was inspected by State Farm representatives and Clayton, together with Gillespie and the Paslays' general contractor, Charlie MacDonald. State Farm gave the Paslays a $25,000 check as an advance regarding the loss. Gillespie and MacDonald estimated that the period potentially required for repairs would be six months, and discussed issues relating to asbestos abatement.

After the inspection, State Farm transferred the Paslays' claim to a team managed by Donna Blazewich that processes long-term catastrophic claims. Blazewich assigned the claim to Radi Stewart, who conferred with Clayton regarding a six-month lease for a residence Clayton had found. To secure the lease, Stewart approved an $85,000 advance and engaged Klein & Company (Klein), a housing vendor. By January 17, 2011, Klein had arranged for a six-month lease beginning on January 20, at $9,000 per month, plus an $18,000 deposit. Klein issued an invoice for $73,657.50, which State Farm paid.

On January 21, 2011, while inspecting the house, Stewart saw that some wallpaper had separated from a master bathroom wall. During the inspection, Clayton voiced concerns regarding the possibility of mold developing in the master bathroom; in addition, he stated that MacDonald wished to remove drywall ceilings throughout the house in order to abate asbestos. Stewart advised Clayton that the homeowners' policy contained a $5,000 coverage limit concerning mold, including the costs of drywall removal for mold, testing, and remediation. In a letter to the Paslays dated January 31, 2011, Stewart noted Clayton's "feel[ing] there may be a potential for mold," and set forth the policy provisions regarding

9

the $5,000 mold coverage limit. Stewart also stated: "[W]e are currently in the process of awaiting the estimate from your contractor regarding the asbestos abatement for the ceiling damaged as a result of the water loss."

On February 9 and 10, 2011, an asbestos abatement subcontractor hired by MacDonald removed drywall ceilings throughout the house. Prior to that work, the Paslays submitted no estimate or proposal regarding asbestos abatement to State Farm for its review and approval. Upon discovering the removal, Stewart advised Clayton that State Farm would review the Paslays' estimated asbestos abatement costs with Gillespie to determine whether they were reasonable.

In early March 2011, Gillespie learned that the only "upgrade" work to the house then required by the Los Angeles Department of Building and Safety was the installation of hard-wired smoke detectors. Shortly afterward, he estimated that the water damage repairs would cost $83,306.76, and that installation of smoke detectors would involve an additional expenditure of $4,200. Gillespie's estimate included $6,815.40 to repair peeling wallpaper in the master bathroom, which was the only damage he had seen there.

In February and March 2011, the Paslays submitted a $262,234.70 repair estimate. Clayton, who had worked as an insurance adjuster but was not a licensed general contractor, was responsible for determining the proposed scope of repairs.[3] State Farm paid the Paslays $71,352.89 as an undisputed portion of the claim.

---

[3] The Paslays did not rely on MacDonald to identify the necessary repairs, even though the repair estimate identified "Macdonald General Contractor" as the "[e]stimator." Macdonald testified that he did not prepare the Paslays' written estimates, although he discussed unit costs with Clayton.

In mid-March 2011, the Paslays applied for -- and later obtained -- a building permit containing the following work description, "Completely remodel (E[xisting]) master bath." Later, in April 2011, Clayton, Blazewich, and Stewart re-inspected the house, accompanied by MacDonald and Gillespie. The master bathroom had been reduced to its studs, and the shower entry reframed.

Following the inspection, Gillespie advised Stewart that demolition of the master bathroom was not needed to repair water damage, and that the installation of smoke detectors did not require a new electrical power box, as the Paslays had proposed. He also told Stewart that removal of the house's drywall ceilings had been unnecessary because scraping the ceilings would have been a less costly method of abating asbestos.

On May 9, 2011, State Farm informed the Paslays that it disputed coverage for the demolition and reconstruction of the master bathroom, the proposed new electrical panel, and the replacement of undamaged ceiling drywall. State Farm agreed to pay for certain other repairs. Gillespie increased his estimate by approximately $10,000 to reflect the approved repairs, and State Farm paid the Paslays an additional $10,062.90 for those items.

In late June 2011, the Paslays submitted a $349,589.27 repair estimate and some invoices. Based on the invoices, State Farm paid the Paslays an additional $4,414.55 for certain emergency work they had undertaken to protect the house. Later, State Farm also paid the Paslays' claims for damage to personal property ($15,232.52, less $2,848.49 in depreciation), and moving expenses related to their rental housing ($9,535.51).

In July 2011, the Paslays' initial six-month lease for their rental residence expired. Thereafter, State Farm authorized payment of their rent on a monthly basis.

11

On September 29, 2011, in a letter to the Paslays, State Farm set forth its coverage positions relating to the disputed scope-of-repair issues. Accompanying the letter was an additional $14,565.19 payment for other repairs that State Farm had determined were subject to coverage, and a $5,000 payment under the mold coverage provisions of the policy.

Although State Farm authorized payment of the Paslays' rent through November 2011, the landlord rented the residence to a different tenant, effective October 31, 2011. At the end of October 2011, the Paslays moved back into their house. Traute testified that when they did so, the kitchen was effectively functional, a bedroom and bathroom were available for use, and the house had water, gas, and electricity. When asked whether the house was then livable, she stated, "'Oh, you can live in it, yeah.'"

In November 2011, State Farm paid the Paslays $1,250 for the cleaning of the house's air ducts. Later, in May 2012, State Farm made a final $540 payment for the installation of an emergency gas shut-off valve, bringing its total payments under the policy to more than $248,000, including $122,770.98 for repairs to the house based on Gillespie's final estimate.[4]

## 2. *The Paslays' Evidence*

In opposing the motion for summary adjudication or judgment, the Paslays maintained there were triable issues regarding numerous aspects of State Farm's conduct with respect to their claim. Our focus is on the admissible evidence they offered in an effort to raise triable issues relevant to their contentions on appeal.

---

[4]  State Farm submitted evidence that its total payments were approximately $267,000, although that sum included an $18,000 refundable security deposit for the Paslays' rented residence.

That showing relied primarily on declarations and deposition testimony from Clayton and MacDonald.

Regarding the work undertaken in the master bathroom, Clayton stated that based on his experience as an insurance adjuster, he was concerned that rain water had infiltrated the master bathroom. On January 21, 2011, during an inspection of the house, he raised that possibility with Stewart, in view of the peeling wallpaper in the master bathroom. Clayton's declaration stated: "I never made a claim for mold in any part of the house, I just expressed my concern that if water had intruded into the walls of the master bathroom, the potential for the development of mold existed." When Stewart described the $5,000 limit for mold coverage in the policy, Clayton repeated his concern, and explained that he was making no claim for mold.

According to Clayton and MacDonald, in mid-February 2011, they examined the master bathroom for hidden water damage, shortly before the Paslays were to leave for a trip overseas. After removing portions of the bathroom's wall, they discovered substantial water damage. In exploring the extent of the damage, they removed cabinets, fixtures, and other parts of the bathroom. Clayton phoned Stewart, discovered that he was unavailable, and left a message requesting an immediate investigation of the water damage. Two days later, Stewart arrived at the house. By then, the wet debris had been removed from the master bathroom and discarded. According to Clayton, at some point, pictures of the wet debris were sent to Stewart. MacDonald stated that the work he performed in the bathroom "was done to repair the damage done by the water intrusion," and Clayton stated that "[t]he cost of repairing the bathroom was in excess of $35,000."

Regarding the removal of the asbestos-covered drywall ceilings, MacDonald stated during State Farm's initial inspection, he and Clayton pointed out water intrusion throughout the house, including the dining room, living room, office, and front bedroom, as well as around the fireplace. Clayton and MacDonald further stated that because there was no attic access to the ceilings in many parts of the house, the only feasible way to determine the extent of the water intrusion was to remove portions of the drywall ceilings. Furthermore, it was not possible to repair the existing ceiling damage or examine for hidden damage by removing and patching areas of the existing ½ inch drywall ceiling without producing unsightly results, as the applicable building code required the use of 5/8 inch drywall. In view of these considerations, Clayton and MacDonald concluded that in order to abate the asbestos on the damaged ceilings, it was necessary to remove and replace the ceilings in their entirety, rather than scrape off the asbestos.

Regarding the replacement of the electrical panel, MacDonald stated: "During the repair work at the house, it was necessary for me to access the electrical panel . . . to turn the electricity off and on. When my electrical contractor and I examined the electrical panel, we were concerned that it was hazardous. I had calculations made of the electrical load which the box needed to serve in the house. Those calculations showed that the box was overloaded beyond its 100 amp[] capacity. Further, the electrical panel appeared to be the original electrical panel installed when the house was built. Because of the amount of work being done in the house, the building code required that hazardous conditions in the house be corrected. [¶] . . . I discussed the issue . . . with [Clayton] and it was agreed the electrical panel should be replaced with a 200 amp[] box to abate the hazard."

14

Regarding the provision of additional living expenses, Clayton stated: "In October[] 2011, we received a telephone call from the landlord's real estate agent informing us that other agents wanted to show the [rented] house. We could not understand what was happening as our house was still under construction, the master bedroom and master bathroom not having been completed. There was no sink, toilet, shower or bathtub in the master bathroom. There were no carpets or floorings in the family room, office or guest bedroom either. [¶] . . . When the landlord's real estate agent was showing the house, we were informed that the house was available for rent as of November 1, 2011. This was the first we heard that our lease was being terminated. [¶] . . . In mid October[] 2011, we received a letter from [Klein], State Farm's agent, advising us we had to vacate the house by the end of October. . . . Accordingly, we were forced to move back into our house before construction was completed."

D. *Analysis*

We conclude the trial court erred in granting summary adjudication with respect to the Paslays' claim for breach of insurance contract, but not with respect to their bad faith and elder abuse claims and request for punitive damages. As explained below (see pt. D.1. of the Discussion, *post*), the Paslays' evidentiary showing raised triable issues regarding two matters relevant to the breach of insurance contract claim, namely, the work undertaken in the master bathroom and the replacement of the drywall ceilings. Nonetheless, those triable issues did not preclude summary adjudication regarding the bad faith and elder abuse claims and the request for punitive damages (see pt. D.2. of the Discussion, *post*).

15

1. *Breach of Insurance Contract*

In order to secure summary adjudication on the breach of insurance contract claim, State Farm sought to show that the Paslays could not demonstrate a critical element of that claim, that is, unpaid policy benefits due the Paslays.[5] We agree with the trial court that State Farm's evidence sufficed to shift the burden to the Paslays to raise triable issues regarding that matter. Accordingly, we examine their showing with respect to the contentions raised on appeal.[6]

a. *Triable Issues Regarding Work in Master Bathroom*

The Paslays' evidence is sufficient to raise triable issues regarding the existence of water damage in the master bathroom for which State Farm failed to pay the costs of repair. State Farm acknowledges that under the policy, it was

---

[5] Generally, "[a]n insured can pursue a breach of contract theory against its insurer by alleging the insurance contract, the insured's performance or excuse for nonperformance, the insurer's breach, and resulting damages." (*San Diego Housing Com. v. Industrial Indemnity Co*. (1998) 68 Cal.App.4th 526, 536.)

[6] To the extent our inquiry requires us to interpret the policy, we apply established rules of contract interpretation. (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470.) Under these rules, "'the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citations.] The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" [citation], controls judicial interpretation. [Citation.]' [Citations.] A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. [Citation.] But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. [Citation.] Courts will not strain to create an ambiguity where none exists. [Citation.]" (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18-19.)

obliged to pay the reasonable and necessary costs of the water damage repairs, subject to the policy's limitations of liability. According to Clayton and MacDonald, in mid-February 2011, after removing certain portions of the bathroom's wall to check for water intrusion, they found significant water damage throughout the bathroom. MacDonald stated that the work done in the bathroom was performed to repair the water damage, and Clayton further stated that "[t]he cost of repairing the bathroom was in excess of $35,000 . . . ." That sum exceeds the total payments State Farm made relating to the master bathroom, namely, $6,815.40 for the repair of peeling wallpaper, and $5,000 for mold testing and remediation. The record thus discloses evidence which, if credited by the fact finder, established unpaid benefits for water damage repairs in the master bathroom.

State Farm maintains the record unequivocally shows that a significant portion of the work undertaken in the master bathroom was a remodeling project, not the repair of water damage. They note that the Paslays' application for a building permit incorporates the work description, "Completely remodel (E[xisting]) master bath," as does the building permit itself. In addition, they observe that Richard Rohaly, a building inspector for the City of Los Angeles, testified in his deposition that he "recalled the master bathroom being remodeled at the house."

State Farm's contention fails, as the characterization of the work done in the bathroom is neither undisputed nor dispositive. The Paslays' architect, who prepared the building permit application, testified that although he developed the work description based on conversations with MacDonald, it was his own description. Rohaly, the building inspector, had no recollection whether the work in the master bathroom was independent of water damage. Moreover, the

17

characterization of the project as a "remodel" does not address whether the work was necessitated by water damage. The amount of the water damage, and the extent to which it required the teardown and rebuilding of the master bathroom, remain triable issues of fact.

State Farm also suggests that the policy's $5,000 coverage limit for mold shields it from liability for any unpaid water damage repairs because the coverage limit is applicable to all mold-related repairs, remediation, and "exploratory work . . . ." We disagree. Generally, "an insurer may limit coverage to some, but not all, manifestations of a given peril, as long as '[a] reasonable insured would readily understand from the policy language which perils are covered and which are not.'" (*De Bruyn v. Superior Court* (2008) 158 Cal.App.4th 1213, 1223, quoting *Julian v. Hartford Underwriters Inc. Co.* (2005) 35 Cal.4th 747, 759.)

Here, the coverage limit for mold cannot reasonably be understood to encompass any water damage in the master bathroom discovered in the course of testing for mold, but directly caused by the leak in the master bedroom. The mold endorsement provides that State Farm will pay no more than $5,000 "for all loss by fungus" to a dwelling "caused by or directly resulting from" a covered peril, including "the cost of any testing or monitoring of . . . property to confirm the type, absence, presence or level of fungus . . . ." On the Paslays' showing, after concerns regarding the potential for mold motivated Clayton and MacDonald to remove portions of the bathroom wall, they discovered water damage directly caused by the covered peril -- namely, the leak in the master bedroom -- throughout the bathroom. Although the coverage limitation applies to the costs of the initial testing to confirm the "absence" or "presence" of mold, it does not encompass the additional costs of repairing the water damage that Clayton and MacDonald claim to have found in the master bathroom, as that damage is not

18

reasonably viewed as a "loss *by fungus*" (italics added). In sum, there are triable issues regarding the existence of unpaid policy benefits relating to water damage in the master bathroom.

### b. *Triable Issues Regarding Drywall Ceilings*

The Paslays' evidence also raises triable issues whether State Farm was obliged to pay for the replacement of the removed drywall ceilings. As explained above (see pts. B & D.1.b. of the Discussion, *ante*), the policy obliged State Farm to pay the reasonable and necessary costs of repairing water-damaged portions of a dwelling "with similar construction," subject to Option OL, which provides coverage for the costs of legally mandated changes to damaged and undamaged parts of the dwelling when "the enforcement" of the law or ordinance "is directly caused by the same [l]oss [i]nsured . . . ." In seeking summary judgment, State Farm acknowledged that as a result of the water damage to ceilings throughout the house, it had agreed to pay for the removal of asbestos from the house's ceilings by scraping, but denied liability for the replacement of the ceilings, arguing that the removal of undamaged portions of the ceilings constituted an unreasonable and unnecessarily costly method of abating asbestos.

The Paslays submitted evidence that aside from asbestos abatement, there was another ground for replacing the ceilings potentially subject to policy coverage. Clayton and MacDonald stated that due to the water damage throughout the house and the absence of attic access, it was necessary to remove portions of the ceilings to repair the damage and check for hidden water intrusion. According to Clayton and MacDonald, it was impossible to make acceptable repairs in a piecemeal fashion to the removed portions of the existing ½ inch drywall ceiling. They maintained that piecemeal repairs would have resulted in uneven and

19

unsightly ceilings, as the applicable building code required the use of 5/8 inch drywall. The Paslays thus argued that only the removal and replacement of the ceilings in their entirety would yield ceilings "with similar construction."

The Paslays also pointed to testimony from Kamran Ravandi, the Los Angeles Department of Building and Safety plan check engineer who issued the Paslays' building permit. Ravandi stated that due to the scope of the work, the Paslays' project was subject to Los Angeles Building Code section 913405.1.2, which states: "Alterations, repairs, rehabilitation in excess of 10 percent of the replacement value of the building or structure may be made provided *all the work conforms to this Code for a new building* and no hazardous conditions . . . are continued or created in the remainder of the building as a result of such work." (Italics added.) Ravandi further testified that the Paslays were required to comply with insulation-related code requirements for ceilings.

In view of this evidence, there are triable issues regarding coverage for replacement of the removed drywall ceilings. Clayton's and MacDonald's testimony, if credited by the fact finder, establish that only removal and replacement of the ceilings (including their undamaged portions) would result in code-compliant ceilings of a "similar construction." Furthermore, Ravandi's testimony supports the reasonable inference that the code-complaint ceilings were subject to coverage under Option OL because their installation was required by the enforcement of the building code. In sum, there are triable issues regarding the existence of unpaid policy benefits relating to replacement of the drywall ceilings.

c. *No Other Triable Issues*

For the reasons discussed below, the Paslays raised no other triable issue regarding unpaid policy benefits due them.

### i. *Replacement of Electrical Panel*

The Paslays contend there are triable issues whether State Farm was obliged to pay the costs of replacing their 100 amp electrical panel with a 200 amp panel, even though the former was not damaged by the leak in the master bedroom. Relying on Los Angeles Building Code section 913405.1.2, they argue that Option OL provided coverage for the replacement. We reject that contention.

As explained above (see pt. B & D.1.b. of the Discussion, *ante*), Option OL affords coverage only for upgrades to a dwelling attributable to "the enforcement" of a law or ordinance "caused by the same [l]oss [i]nsured" requiring repairs to the dwelling. In seeking summary adjudication, State Farm presented evidence (1) that the 100 amp panel was inadequate for the house's power usage *prior* to the leak in the master bathroom, (2) that city officials did not ask the Paslays to install the new panel, and (3) that the sole electricity-related change to the house required by city officials under the building code -- namely, the installation of smoke detectors -- did not materially increase the load on the 100 amp panel. On that showing, the panel's replacement was not due to repair-related enforcement of the building code, and thus constituted an independent upgrade to the house.

In an effort to raise triable issues, the Paslays maintained they were obliged to eliminate hazardous conditions in the house, arguing that Los Angeles Building Code section 913405.1.2 required them to rectify existing hazards in the house. They submitted evidence that during the course of the repairs, Clayton and MacDonald determined that the 100 amp electrical panel was inadequate for the house.

The Paslays raised no triable issues, as nothing in the record suggests that the hazardous condition presented by the 100 amp panel was "continued or

created" in the house "as a *result* of" the repair work. (Italics added.) In construing a statute or ordinance, we look first to its language, as commonly understood, and avoid interpretations that render words or phrases surplusage. (*Chaffee v. San Francisco Public Library Com.* (2005) 134 Cal.App.4th 109, 114.) Los Angeles Building Code section 913405.1.2, states that repairs "may be made provided . . . no hazardous conditions . . . are continued or created in the remainder of the building *as a result of such work.*" (Italics added.) Interpreting the provision to require the remediation of all "continu[ing]" hazards, regardless of their relationship to the repairs, would nullify the italicized phrase.

The Paslays' contention thus fails for want of evidence that the repair work *itself* created or continued any hazard posed by the panel. That work involved no repairs or changes to the house's electrical system other than the installation of smoke detectors, which did not increase the load on the panel. Accordingly, there are no triable issues regarding coverage for the replacement of the electrical panel.[7]

## ii. *Additional Living Expenses*

The Paslays contend there are triable issues whether State Farm fully paid benefits due them for additional living expenses. Under Coverage C, the policy provides in pertinent part: "When a [l]oss [i]nsured causes the residence premises

---

[7] In view of our conclusion, it is unnecessary to address the Paslays' related contention that under Option OL, the phrase "enforcement of a building, zoning or land use ordinance or law" encompasses voluntary compliance with a code provision by a general contractor. For the reasons discussed above, even if MacDonald's replacement of the panel constituted "enforcement" of the building code, that conduct was not "caused by the same [l]oss [i]nsured" that required repairs to the dwelling.

22

to become uninhabitable, we will cover the necessary increase in costs *you incur* to maintain your standard of living up to 24 months." (Italics added.) The policy further states that those benefits are available no longer than "the time required to repair or replace the premises . . . ."

In seeking summary adjudication, State Farm submitted evidence that in January 2011, it paid for a six-month lease for a residence through Klein, its housing vendor. After July 2011, when the initial six-month lease expired, State Farm authorized payment of the Paslays' rent on a monthly basis. Although State Farm authorized payment of the rent through the end of November 2011, the landlord rented the residence to a new tenant, effective October 31, 2011. In early October 2011, Klein sent the Paslays a formal "move-out" notice that asked whether they desired further temporary housing. The Paslays requested no alternative housing, and moved back into their house. According to Traute, the house was then habitable.

The Paslays offered no evidence that they "incur[red]," or sought to incur, additional living expenses when their rented residence was leased to a new tenant. According to Clayton's declaration, after the landlord and Klein notified them that they needed to vacate the rented residence, they moved back to their house, which was still under repair. The Paslays otherwise submitted no evidence that State Farm was responsible for their displacement from the rented house, that they ever informed Klein or State Farm that they desired alternative rented housing, or that they incurred any increased costs to maintain their standard of living upon returning to their house. The record thus discloses no triable issues regarding unpaid additional living expenses owed the Paslays.

### iii. *Total Unpaid Repair Costs*

The Paslays rely on the fact that they spent $164,093.86 more than State Farm paid them to establish a triable issue of fact on their breach of contract claim. As we have concluded there are triable issues regarding unpaid policy benefits relating to certain repairs (see pt. D.1.a & D.1.b. of the Discussion, *ante*), we examine this contention solely to determine whether it identifies an independent basis for denying summary adjudication. In our view, it does not.

The Paslays maintain that State Farm improperly relied on Gillespie's repair estimates because the policy required State Farm to pay the actual costs of repairing the house "with similar construction." To establish the actual repair costs subject to policy coverage, they rely on Clayton's declaration, which evaluates those costs as $164,093.86.

The Paslays' contention fails for two reasons. First, under the policy, State Farm was obliged to pay "the reasonable and necessary cost to repair" subject to policy coverage, *not* the actual costs of repair the Paslays incurred. As insurers may properly rely on independent experts to assist in determining repair benefits due under an insurance policy (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins.* Co. (2001) 90 Cal.App.4th 335, 346 (*Chateau Chamberay Homeowners Assn.*), disapproved on another ground in *Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 724, fn. 7 (*Wilson*); *Fraley v. Allstate Ins. Co.* (2000) 81 Cal.App.4th 1282, 1292-1293 (*Fraley*); see *Lincoln Fountain Villas Homeowners Assn. v. State Farm Fire & Casualty Ins. Co.* (2006) 136

Cal.App.4th 999, 1001-1008), State Farm did not breach the contract merely by relying on Gillespie's repair estimates.[8]

Second, Clayton's declaration cannot be regarded as raising triable issues regarding unpaid benefits beyond those identified above. To the extent the declaration states that the $164,093.86 in unpaid repair costs were *subject to policy coverage*, the trial court sustained State Farm's objections to the relevant portion of the declaration, and the Paslays have not challenged that ruling on appeal. The Paslays may not rely on the stricken portion of the declaration to raise a triable issue of fact. (*Everett*, *supra*, 162 Cal.App.4th at pp. 654, 658-659.) Moreover, Clayton's declaration identifies the actual unpaid costs as $164,093.86 without enumerating the items encompassed under that sum, aside from stating that it includes the costs of repairs purportedly "required to comply with the building code . . . ." As explained above, one such item -- namely, the replacement of the electrical panel -- is not subject to policy coverage. Accordingly, evidence that the Paslays expended more than State Farm paid them does not itself establish a triable issue of fact on the breach of insurance contract claim.

---

[8] The Paslays' reply brief argues that the "reasonable and necessary" repair costs due under the policy necessarily presents a factual issue that cannot be resolved on summary judgment. We disagree. When a breach of insurance contract claim is predicated on the coverage provisions applicable here, summary judgment in the insurer's favor on the claim is proper when the insured raises no triable issue whether the insurer paid the "reasonable and necessary cost to repair" under the policy. (*Everett v. State Farm General Ins. Co.* (2008) 162 Cal.App.4th 649, 658-659 (*Everett*); see *West v. State Farm Fire and Cas. Co.* (9th Cir. 1989) 868 F.2d 348, 351 ["Reasonableness becomes a question of law appropriate for determination on motion for summary judgment when only one conclusion about the conduct's reasonableness is possible"].)

25

### d. *Summary*

As there are triable issues regarding unpaid policy benefits due the Paslays related to the work in the master bathroom and the replacement of drywall ceilings (see pt. D.1.a & D.1.b. of the Discussion, *post*), summary adjudication was improperly granted with respect to the claim for breach of insurance contract.

### 2. *Remaining Claims*

In granting summary judgment in favor of State Farm, the trial court concluded that the Paslays' claims failed for want of a triable issue regarding unpaid policy benefits, but identified an alternative basis for granting summary adjudication on the Paslays' claims for bad faith, elder abuse, and punitive damages. The court stated that had it been required to address those claims, it would granted summary adjudication on each in light of the "genuine dispute" doctrine. As explained below, we agree with that determination.

### a. *Bad Faith*

To establish bad faith, the Paslays must demonstrate misconduct by State Farm more egregious than an incorrect denial of policy benefits. "The law implies in every contract, including insurance policies, a covenant of good faith and fair dealing." (*Wilson, supra,* 42 Cal.4th at p. 720.) The obligation imposed on the insurer under the covenant "'is not the requirement mandated by the terms of the policy itself . . . . It is the obligation . . . under which the insurer must act fairly and in good faith in discharging its contractual responsibilities.'" (*California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 54, italics omitted, quoting *Gruenberg v. Aetna Ins. Co*. (1973) 9 Cal.3d 566, 573-574.) In the context of a bad faith claim, "an insurer's denial of or delay in paying benefits

26

gives rise to tort damages only if the insured shows the denial or delay was unreasonable." (*Wilson*, *supra*, 42 Cal.4th at p. 723.)

Under this standard, "an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith[,] even though it might be liable for breach of contract." (*Chateau Chamberay Homeowners Assn.*, *supra*, 90 Cal.App.4th at p. 347.) That is because "whe[n] there is a genuine issue as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute." (*Ibid.*, italics deleted.) An insurer may thus obtain summary adjudication of a bad faith cause of action "by establishing that its denial of coverage, even if ultimately erroneous and a breach of contract, was due to a genuine dispute with its insured." (*Bosetti v. United States Life Ins. Co. in City of New York* (2009) 175 Cal.App.4th 1208, 1237 (*Bosetti*).)

The genuine dispute doctrine "does not relieve an insurer of its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim. A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds." (*Wilson*, *supra*, 42 Cal.4th at p. 723, italics omitted.) Those grounds include reasonable reliance on experts hired to estimate repair benefits owed under the policy. (*Chateau Chamberay Homeowners Assn.*, *supra*, 90 Cal.App.4th at p. 348; *Fraley*, *supra*, 81 Cal.App.4th at pp. 1282, 1292-1293.) The reasonableness of the insurer's decision is assessed by reference to an objective standard (*Bosetti*, *supra*, 175 Cal.App.4th at pp. 1238-1240; see *Brehm v. 21st Century Ins. Co.* (2008) 166 Cal.App.4th 1225, 1238-1240.) The application of the genuine dispute doctrine "becomes a question of law where the

evidence is undisputed and only one reasonable inference can be drawn from the evidence." (*Chateau Chamberay Homeowners Assn.*, *supra*, 90 Cal.App.4th at p. 346.)

We conclude that the Paslays' bad faith claim fails under the genuine dispute doctrine. The only triable issues relating to unpaid policy benefits concern the work in the master bathroom and the replacement of drywall ceilings. Regarding those benefits, the record discloses only a genuine dispute regarding the extent of the damage and required repairs. "Where the parties rely on expert opinions, even a substantial disparity in estimates for the scope and cost of repairs does not, by itself, suggest the insurer acted in bad faith." (*Fraley*, *supra*, 81 Cal.App.4th at p. 1293.) The evidence shows only that Gillespie, State Farm's expert, promptly examined the master bathroom and drywall ceilings, assessed the extent and type of damage, and estimated the costs of the appropriate repairs.[9]

---

[9] The Paslays suggest there are triable issues regarding the genuineness of the disputes concerning the master bathroom and the drywall ceilings. Regarding the master bathroom, they argue that Stewart's invocation of the $5,000 mold coverage limitation contravened a State Farm operation guide. That guide states: "'If the mold is the result of a loss rather than the cause of it, coverage must be analyzed for the event that caused the mold. If the most important proximate cause of the loss is covered, mold resulting from the covered event is also covered.'"

In our view, the guide cannot reasonably be regarded as raising a triable issue regarding State Farm's claims handling. The guide merely addresses investigations into the causes of mold -- which was *never* found in the master bathroom -- and does not discuss the mold coverage limitation.

Regarding the drywall ceilings, the Paslays contend State Farm improperly refused to pay for their replacement because it paid for their removal. That contention fails in light of the record, which establishes the following undisputed facts: During the January 2011 inspections, the parties discussed issues relating to asbestos abatement. In February 2011, without submitting their estimate for

*(Fn. continued on next page.)*

The Paslays contend there are triable issues whether State Farm adequately investigated the damage in the master bathroom and to the ceilings. We disagree. Generally, the reasonableness of an insurer's conduct "must be evaluated in light of the totality of the circumstances surrounding its actions." (*Wilson*, *supra*, 42 Cal.4th at p. 723.) Thus, the adequacy of the insurer's claims handling is properly assessed in light of conduct limiting the insurer's investigation by parties with an interest in policy benefits. In *Blake v. Aetna Life Ins. Co.* (1979) 99 Cal.App.3d 901, 905-906, the plaintiff's husband was insured under a life insurance policy that provided $10,000 to the plaintiff as beneficiary upon "due proof" of accidental death. After the husband died from a lethal dose of a prescription drug, the insurer assigned an investigator, who unsuccessfully attempted to obtain information from the plaintiff regarding the husband's state of mind before his death and the source of the fatal drugs. (*Id*. at pp. 911-912.) When the insurer made no payment of the accidental death benefits after 16 months of investigation,

---

asbestos abatement to State Farm, the Paslays arranged for an asbestos abatement subcontractor to remove the pertinent ceilings. State Farm paid the subcontractor's $5,630 fee as an item of the undisputed portion of the Paslays' claim, but asked Gillespie to assess the Paslays' claim for funds to replace the ceilings as "an expanded scope of work." In July 2011, Gillespie informed State Farm (1) that his original estimate had adequately provided for any necessary repairs for water intrusion, and (2) that scraping asbestos from the drywall ceilings would have been a less costly method of abatement than removing the ceilings. As State Farm paid for repairs in accordance with Gillespie's estimates *and* the asbestos abatement subcontractor's $5,630 fee, the record establishes only a genuine dispute regarding whether the Paslays were entitled to additional funds to replace the drywall ceilings.

In a related contention, the Paslays suggest that State Farm failed to examine why they removed the ceilings. That contention is unsupported by the record, which discloses only that Gillespie considered the documents the Paslays later submitted in connection with the ceilings.

29

the plaintiff asserted claims for breach of insurance contract and bad faith against the insurer. (*Id*. at pp. 916-917.) The appellate court reversed judgment on the bad faith claim, concluding that trial evidence showed the insurer had done all it reasonably could to determine the cause of death, in view of the plaintiff's failure to supply critical information. (*Id*. at pp. 920-921.)

Here, the Paslays curtailed State Farm's ability to investigate the damage in the master bathroom and to the ceilings, notwithstanding the policy provisions regarding their "[d]uties [a]fter [l]oss," which included an obligation to "exhibit" the damage property "as often as [State Farm] . . . require[d]." Viewed in the light most favorable to the Paslays, the record shows that in January 2011, during inspections of the house, the parties discussed asbestos abatement to the damaged ceilings, and Clayton "expressed [his] concern that if water had intruded into the walls of the master bathroom, the potential for the development of mold existed." In a letter dated January 31, 2011, Stewart noted Clayton's "feel[ing] there may be a potential for mold," set forth the $5,000 mold coverage limit, and stated: "[W]e are currently in the process of awaiting the estimate from your contractor regarding the asbestos abatement for the ceiling damaged as a result of the water loss."

In mid-February 2011, before submitting any estimate regarding asbestos abatement, the Paslays removed the ceilings. At approximately the same time, Clayton and Macdonald examined the master bathroom for hidden water damage, and removed cabinets, fixtures, and other parts of the bathroom. Clayton phoned Stewart, learned that he was unavailable, and requested an immediate investigation of the newly discovered damage. By the time Stewart arrived at the house two days later, the debris from the master bathroom had been discarded. At some point, Stewart was sent photographs displaying piles of debris. Stewart

30

subsequently informed the Paslays that the demolition of the bathroom "down to the framing" prior to any agreement on the scope of work was prejudicial to State Farm.[10]

On this record, there are no triable issues regarding the adequacy of State Farm's investigation, as the Paslays removed the damaged property before State Farm had an opportunity to conduct a full assessment of the Paslays' proposals and contentions. The record shows only that State Farm did what it could to assess the claimed losses before denying them. In our view, even if those denials were mistaken, nothing suggests that State Farm acted in bad faith. Summary adjudication was therefore proper on the bad faith claim.[11]

### b. *Elder Abuse*

We next examine Traute's claim for elder abuse. Under the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15600 et seq.), an

---

[10]     In a letter dated March 17, 2011, Stewart set forth the policy provisions regarding the Paslays' duties after a loss, and stated: "Based on our inspection of February 18, 2011[,] the master bathroom has been demolished down to the framing . . . . [¶] Since the property has been removed State Farm has been prejudiced by the removal of your property prior to any agreement . . . ." Although State Farm raised the Paslays' failure to provide an opportunity to inspect the alleged damage or supply estimates of the cost of repairs prior to dismantling the master bathroom and removing the ceilings, it did not assert as a separate ground for summary judgment that the Paslays had breached their obligations under the insurance contract.

[11]     The Paslays suggest that State Farm engaged in bad faith because in August 2011, after the pertinent dispute arose, State Farm asked them to communicate with it through its counsel. We disagree, as there is no evidence that the request reflected any failure to "to thoroughly and fairly investigate, process and evaluate the [Paslays'] claim." (*Wilson*, *supra*, 42 Cal.4th at p. 723.)

elder is "any person residing in this state, 65 years or older." (Welf. & Inst. Code, § 15610.27.)[12] Section 15610.30 broadly defines financial abuse of an elder as occurring when a person or entity "[t]akes, secretes, appropriates, obtains, or retains real or personal property of an elder" for "a wrongful use or with intent to defraud, or both," as well as "by undue influence . . . ."[13] (§ 15610.30, subds. (a)(1), (a)(3).)

As there is no dispute that Traute was 80 years old when the rain water leak damaged the house, the focus of our inquiry is on whether there are triable issues regarding the existence of financial abuse.[14] In view of our discussion regarding the Paslays' breach of insurance contract and bad faith claims (see D.1. and D.2.a. of the Discussion, *ante*), we see no evidence that State Farm retained policy benefits owed to Traute with an intent to defraud or by undue influence. The key question thus concerns the existence of triable issues regarding "a wrongful use" of policy benefits. For the reasons discussed below, we conclude the evidence below raised no such issues.

Subdivision (b) of 15610.30 provides a person or entity is "deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if,

---

[12] All further statutory citations are to the Welfare and Institutions Code, unless otherwise indicated.

[13] In this context, "'[u]ndue influence' consists: [¶] 1. In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him; [¶] 2. In taking an unfair advantage of another's weakness of mind; or, [¶] 3. In taking a grossly oppressive and unfair advantage of another's necessities or distress.'" (*Bounds v. Superior Court* (2014) 229 Cal.App.4th 468, 479, quoting Civ. Code, § 1575.)

[14] The evidence otherwise establishes that Clayton was 60 years old at the time of that incident.

among other things, the person or entity takes, secretes, appropriates, obtains, or retains possession of property and the person or entity knew or should have known that this conduct is likely to be harmful to the elder . . . adult." (§ 15610.30, subd. (b).) The provision further specifies that a person or entity "takes, secretes, appropriates, obtains, or retains real or personal property when an elder or dependent adult is deprived of any property right, including by means of an agreement . . . ." (§ 15610.30, subd. (c).) Thus, a party may engage in elder abuse by misappropriating funds to which an elder is entitled under a contract. (See *Wood v. Jamison* (2008) 167 Cal.App.4th 156, 164-165 [elder's attorney engaged in financial abuse by improperly accepting as fee certain funds to which elder was entitled through loan]; *Bonfigli v. Strachan* (2011) 192 Cal.App.4th 1302, 1307, 1315-1316 [plaintiffs stated elder abuse claim based on defendant's exercise of contract-based power of attorney and failure to pay funds admittedly owed under contract].)

Traute's elder abuse claim presents a question of statutory interpretation regarding the term "wrongful use." As explained above, there are triable issues whether State Farm breached the insurance contract, but none whether State Farm acted in bad faith, in view of the genuine dispute doctrine. The issue thus presented is whether a merely incorrect denial of policy funds under the circumstances shown here may constitute a "wrongful use" of those funds, for purposes of an elder abuse claim.

We begin by observing that to establish a "wrongful use" of property to which an elder has a contract right, the elder must demonstrate a breach of the contract, or other improper conduct. In *Stebley v. Litton Loan Servicing, LLP* (2011) 202 Cal.App.4th 522, the trial court sustained a demurrer without leave to amend to the plaintiffs' complaint, which asserted a claim for wrongful

33

foreclosure and a claim for elder abuse based on the foreclosure. (*Id*. at pp. 524-525.) After affirming the ruling with respect to the wrongful foreclosure claim, the appellate court held that the elder abuse claim also failed, concluding that a lender does not engage in financial abuse of an elder by properly exercising its rights under a contract, even though that conduct is financially disadvantageous to an elder. (*Id*. at pp. 527-528.)

Subdivision (b) of 15610.30 imposes an additional requirement beyond the existence of improper conduct, namely, that "the person or entity *knew or should have known* that this conduct is likely to be harmful to the elder . . . adult." (Italics added.) In statutes and other legal contexts, the italicized phrase ordinarily conveys a requirement for actual or constructive knowledge. (E.g., *Castillo v. Toll Bros., Inc.* (2011) 197 Cal.App.4th 1172, 1196 [Labor Code section 2810, subdivision (a), which bars a person from entering into enumerated contracts when the person "'knows or should know'" that specified contract condition is absent, imposes requirement for actual or constructive knowledge].) Generally, constructive knowledge, "means knowledge 'that one using reasonable care or diligence should have, and therefore is attributed by law to a given person', [and] encompasses a variety of mental states, ranging from one who is deliberately indifferent in the face of an unjustifiably high risk of harm [citation] to one who merely should know of a dangerous condition [citation].)" (*John B. v. Superior Court* (2006) 38 Cal.4th 1177, 1190-1191, quoting Black's Law Dict. (7th ed.1999) p. 876.) The existence of constructive knowledge is assessed by reference to an objective "reasonable person" measure, "since there is no other way to measure it." (*New v. Consolidated Rock Products Co.* (1985) 171 Cal.App.3d 681, 690.)

Here, our focus is on the deprivation of property due an elder under a contract. In that context, the italicized phrase imposes a requirement in addition to the mere breach of the contract term relating to the property, as the existence of such a breach ordinarily does not hinge on the state of mind or objective reasonableness of the breaching party's conduct. (See *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 373.) In view of the italicized phrase, we conclude that under subdivision (b) of 15610.30, wrongful conduct occurs only when the party who violates the contract actually knows that it is engaging in a harmful breach, or reasonably should be aware of the harmful breach.[15]

The evidence before the court did not raise a triable issue whether those circumstances obtain here. As explained above, notwithstanding the existence of triable issues regarding policy benefits due the Paslays, there is no evidence that

---

[15]     Our conclusion receives additional support from the legislative history of the current version of section 15610.30, the pertinent provisions of which were enacted in 2008. (Stats. 2008, ch. 475, § 1, pp. 3364-3365.) The previous version of the statute stated in pertinent part: "(b) A person or entity shall be deemed to have . . . retained property for a wrongful use if, among other things, the person or entity . . . retains possession of property in bad faith. [¶] (1) A person or entity shall be deemed to have acted in bad faith if the person or entity knew or should have known that the elder . . . had the right to have the property transferred or made readily available . . . ." The legislative analyses accompanying the 2008 legislation reflect an intent to shift the proof required for "wrongful conduct" to "the defendant's knowledge or presumed knowledge of the effect of the taking on the elder, . . . to which a reasonable person standard may be applied." (Sen. Jud. Com., Financial Abuse of Elder or Dependent Adults, March 25, 2008, p. 9 [discussing S.B. 1140 (2007-2008 Reg. Sess.)]; Assem. Com. on Judiciary, Elder and Dependent Adults: Financial Abuse, June 17, 2008, p. 5 [discussing S.B. 1140 (2007-2008 Reg. Sess.)].) In our view, the legislative history does not
*(Fn. continued on next page.)*

35

State Farm acted in subjective bad faith or unreasonably in denying additional benefits. Traute's elder abuse claim thus fails in light of the evidence supporting the application of the genuine dispute doctrine to the Paslays' bad faith claim.

*Negrete v. Fidelity and Guar. Life Ins. Co.* (C.D.Cal. 2006) 444 F.Supp.2d 998, upon which Traute relies, is distinguishable. There, the plaintiff asserted several class claims against an insurer, including claims for breach of fiduciary duty and elder abuse, alleging that the insurer employed deceptive practices in selling annuities to senior citizens. (*Id*. at pp. 999-1000.) The federal court concluded that the fraud allegations were sufficient to state an elder abuse claim. (*Id*. at pp. 1001-1003.) In contrast, Traute raised no triable issues regarding the existence of bad faith or unreasonable conduct by State Farm. Accordingly, summary adjudication was properly granted with respect to Traute's elder abuse claim.

### c. *Punitive Damages*

We conclude that summary adjudication was proper with respect to the Paslays' request for punitive damages. "In the absence of an independent tort, punitive damages may not be awarded for breach of contract . . . ." (*Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 61.) Punitive damages are thus unavailable in connection with the Paslays' breach of insurance policy claim, notwithstanding the existence of triable issues regarding unpaid policy benefits due the Paslays. Furthermore, as the claims for bad faith and elder abuse fail for want of a triable issue of fact, the Pasleys have asserted no tort cause of

---

demonstrate an intent to deem mere breaches of contract actionable instances of elder abuse.

action capable of supporting an award of punitive damages.  Accordingly, summary adjudication was properly granted with respect to the Paslays' request for punitive damages.

## DISPOSITION

The judgment is reversed with respect to the claim in the SAC for breach of insurance contract, and affirmed with respect to the remaining claims and request for punitive damages.  The matter is remanded for further proceedings in accordance with this opinion.  The parties are to bear their own costs on appeal.

**CERTIFIED FOR PARTIAL PUBLICATION**


MANELLA, J.


We concur:



EPSTEIN, P. J.



COLLINS, J.